[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 19-10405
Non-Argument Calendar
_____

D.C. Docket No. 2:19-cv-00088-WKW-CSC

DOMINEQUE HAKIM MARCELLE RAY,

Plaintiff - Appellant,

versus

COMMISSIONER, ALABAMA DEPARTMENT OF CORRECTIONS,

Defendant - Appellee.

_____

Appeal from the United States District Court
for the Middle District of Alabama
_____

Before MARCUS, WILSON and MARTIN, Circuit Judges.

MARCUS, Circuit Judge:

Petitioner Domineque Ray has moved this Court for an emergency stay of

his execution, scheduled to take place at 6:00 p.m. (CST) on February 7, 2019 at

the Holman Correctional Facility ("Holman") in Atmore, Alabama, for the 1995

rape, robbery, and murder of fifteen-year-old Tiffany Harville.  He also appeals from the determination of the district court denying his emergency motion for a stay and dismissing two of his claims under the Religious Land Use and Institutionalized Persons Act of 2000 ("RLUIPA"), 42 U.S.C. § 2000cc et seq., and under § 1983 and the Establishment Clause of the First Amendment.

I.

Precious little in the way of evidence has been adduced at this late hour. Based on our review of the amended complaint, the responses each party has made to a series of questions posed to them by the district court, and the short hearing held by the trial court on January 31, we know this much: Domineque Ray has been a committed Muslim since at least 2006.  He has been meeting with his current Imam, Yusef Maisonet of Masjid As Salaam, who has provided religious ministry to Muslim prisoners in Holman since 2015.  Ray's Imam has stated that Ray was a devout Muslim when the Imam began his ministry at Holman and that Ray continues to be committed to Islam to this day.  Moreover, the Commissioner of the Alabama Department of Corrections ("ADOC") does not dispute the sincerity of Ray's religious beliefs.

On January 23, 2019, Ray met with the Warden of Holman, Cynthia Stewart, who, apparently for the first time, explained to Ray the practices and policies that were followed by the ADOC during the administration of the death

2

penalty.  Among other things, the Warden explained that Chaplain Chris Summers would be in the execution chamber during the administration of the lethal injection. The state[1] has further explained that since 1997 Chaplain Summers has witnessed nearly every execution conducted in the state of Alabama as part of his official duties.  During the execution, Chaplain Summers, a Christian, will kneel at the side of the prisoner and pray with him if the inmate requests prayer.  If the inmate does not want pastoral care from Chaplain Summers, he will remain in the execution chamber standing unobtrusively by the wall.  The inmate's designated witnesses, limited to six, along with any spiritual advisor other than Chaplain Summers, may be seated in a witness room, separated from the death chamber by a large window.

During the January 23 meeting with the Warden, Ray made three requests for the accommodation of his religious beliefs: first, that his Imam be present in order to provide spiritual guidance for him at the time of his death; second, that the institutional Christian Chaplain be excluded from the chamber; and, finally, that he not be required to undergo an autopsy because it conflicted with his religious beliefs.  The Warden denied the first two requests and explained that she had no decisional authority over the autopsy.

---

[1] The Commissioner of the Alabama Department of Corrections is the defendant in this suit, but since he is being sued in his official capacity, we will refer to him as "the state" or "Alabama."

3

On the same day, Ray also met with Chaplain Summers and again requested the presence of an imam and that Chaplain Summers not be present in the execution chamber during his execution.  The Chaplain told Ray that his requests could not be honored due to ADOC policy.  When Ray asked both Warden Stewart and Chaplain Summers if he could see a copy of the prison's policy that dictated these arrangements, he was told that he could not.

We also know that Ray has met with his Imam in a contact visit at Holman as recently as January 29, and had another such visit scheduled for January 30.  Moreover, according to the state, his Imam may visit with him in the days leading up to and on the execution day itself.  Further, his Imam may accompany him to a holding cell adjacent to the execution chamber and remain with him until the inmate makes the final walk to the chamber.

Ray filed his civil rights complaint and emergency motion for stay of execution in the United States District Court for the Middle District of Alabama on January 28, 2019, and lodged an amended complaint on January 31.  Ray's amended complaint makes four claims.  First, Ray says that excluding his Imam from the execution chamber at the time of his execution in favor of a Christian chaplain violates his rights under the Religious Land Use and Institutionalized Persons Act.  Second, he claims that requiring the presence of a Christian chaplain in the execution chamber at the time of his execution also violates his rights under

4

RLUIPA. Third, Ray alleges that Alabama's practice of requiring a Christian chaplain in the execution chamber, while forbidding clerics of other faiths, violates the Establishment Clause of the First Amendment.[2] Finally, Ray submits that refusing to honor his late election for nitrogen hypoxia as the method of his execution, where his lateness resulted from his religious beliefs, also violates RLUIPA. Setting aside the final claim, which he has not preserved for our present purposes, Ray's amended complaint seeks two basic accommodations: that the state not allow the presence of Holman's Christian Chaplain and that his Imam be allowed in the execution chamber so that he may receive spiritual guidance and comfort from a cleric of his own faith.

The district court set a hearing for January 31 and issued an order to show cause to the state asking why the procedures Ray challenged were permissible. The order also directed the Commissioner to answer a series of questions about Ray, the Chaplain, and ADOC procedures, and to file under seal the prison's relevant written policies or procedures. On January 31, 2019, Alabama responded and moved to dismiss Ray's complaint.

---

[2] Although Ray did not mention Title 42 U.S.C. § 1983 as the method by which he was asserting his Establishment Clause claim, the Supreme Court has made it clear that he need not expressly invoke that provision. See Johnson v. City of Shelby, 135 S. Ct. 346, 347 (2014) (holding that "no heightened pleading rule requires plaintiffs seeking damages for violations of constitutional rights to invoke § 1983 expressly in order to state a claim").

The state's response included further details about ADOC policies and procedures as well as a thoroughly redacted version of the prison's relevant procedures, filed under seal.  The state further explained that Chaplain Summers has been an ADOC employee since 1990 and is "familiar with the technicalities of the execution protocol."  If an inmate wishes, he "will kneel at [the inmate's] side and pray with him" during the execution.  The state explained that it "ha[d] not previously accommodated any prisoner's request that the institutional Chaplain not be present in the execution chamber."  Nor had it "executed a prisoner by lethal injection without a chaplain attending the execution."

The state added that Ray would be allowed visitation with his spiritual advisor on the day of execution.  Citing the confidential procedures, the state explained that "shortly before his execution, a condemned inmate is permitted to meet with the spiritual advisor of his choosing."  The spiritual advisor may then observe the execution from the viewing room, along with the inmate's relatives, friends, and members of the media.

Although Alabama expressly disclaimed any constitutional defect in requiring the presence of the prison's Christian Chaplain, the state agreed to accommodate Ray's request and exempt the institution's Chaplain from the execution chamber.   Alabama reiterated, though, that it would not permit Ray's Imam to take the Chaplain's place.  The state explained that it "will not permit a

6

non-ADOC employee, someone unfamiliar with the execution process and with the practices and safety concerns of the prison, to be in the chamber in the chaplain's place." Having made this concession, Alabama responded to the show cause order's inquiries about the lawfulness of its practices by alleging that the issues had become moot.

The district court took oral argument on January 31. Beyond the answers that were given in the parties' written responses, no additional facts were adduced at the hearing. Ray requested, however, a "quick evidentiary hearing," and specifically suggested that, among other things, the prison Chaplain could "testify by telephone" within the next few days and be asked "what training he received and how difficult it would be for him to walk Mr. Ray's Imam through that training." The state, although it did not request a hearing, said that, if appropriate, it could offer evidence supporting its position.

The following day, the district court issued an order denying the motion to stay execution and dismissing Counts 2 and 3 of Ray's complaint. At the heart of its holding, the court found Ray "guilty of inexcusable delay," which, it said, yielded a "strong equitable presumption against granting a stay." The trial court explained that "Ray has had ample opportunity in the past twelve years to seek a religious exemption, instead of waiting until the eleventh hour to do so." Moreover, the district court found that Ray was not likely to succeed on the merits.

7

Addressing the RLUIPA claim, and only the RLUIPA claim, on the merits the court determined that Ray had not identified a substantial burden on his religious exercise, that Ray had not shown it was substantially likely that Alabama lacked a compelling interest in keeping all clerics other than the prison Chaplain out of the execution chamber, and, finally, that Ray had failed to adequately establish that a less restrictive means of furthering that interest was available.  The state's agreement to remove the Chaplain, the court offered, had mooted Ray's claim under the Establishment Clause.

After review of this exceedingly limited record, we reject the district court's analysis, and its refusal to grant an emergency stay in the face of what we see as a powerful Establishment Clause claim.  Because Ray has demonstrated a substantial likelihood of success on the Establishment Clause and because the other equitable factors tip in his favor, Ray's emergency motion for stay is granted.  We direct the Clerk of Court to expedite the appeal of Ray's case so that we may promptly address and resolve these claims.

## II.

"It is by now hornbook law that a court may grant a stay of execution only if the moving party establishes that: (1) he has a substantial likelihood of success on the merits; (2) he will suffer irreparable injury unless the injunction issues; (3) the stay would not substantially harm the other litigant; and (4) if issued, the injunction

8

would not be adverse to the public interest." Arthur v. Comm'r, Ala. Dep't of Corr., 840 F.3d 1268, 1321 (11th Cir. 2016) (quoting Brooks v. Warden, 810 F.3d 812, 818 (11th Cir. 2016) (emphases in original)). "[W]e review the denial of a stay of execution only for abuse of discretion." Brooks, 810 F.3d at 818.

## A.

We begin, as we must, with "the first and most important question" concerning a stay of execution: whether Ray is substantially likely to succeed on the merits of his claims. Jones v. Comm'r, Ga. Dep't of Corr., 811 F.3d 1288, 1292 (11th Cir. 2016).

The First Amendment to the United States Constitution commands that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof." U.S. Const., amend. I. The Supreme Court has long since made this command binding on the states as well. See Cantwell v. Connecticut, 310 U.S. 296, 303 (1940); Murdock v. Commonwealth of Pennsylvania, 319 U.S. 105, 108 (1943); Everson v. Bd. of Educ. of Ewing Twp., 330 U.S. 1, 8 (1947).

The claim presented by Domineque Ray touches at the heart of the Establishment Clause. Indeed, we can think of no principle more elemental to the Establishment Clause than that the states and the federal government shall not favor one religious denomination over another. In the words of the Supreme

9

Court: "The clearest command of the Establishment Clause is that one religious denomination cannot be officially preferred over another." Larson v. Valente, 456 U.S. 228, 244 (1982). Since Everson v. Board of Education, the Supreme Court "has adhered to the principle, clearly manifested in the history and logic of the Establishment Clause, that no State can 'pass laws which aid one religion' or that 'prefer one religion over another.'" Larson, 456 U.S. at 246 (quoting Everson, 330 U.S. at 15).

"[T]his principle of denominational neutrality has been restated on many occasions. In Zorach v. Clauson, 343 U.S. 306 (1952), [the Supreme Court] said that '[t]he government must be neutral when it comes to competition between sects.' Id. at 314. In Epperson v. Arkansas, 393 U.S. 97 (1968), [the Supreme Court] stated unambiguously: 'The First Amendment mandates governmental neutrality between religion and religion. . . . The State may not adopt programs or practices . . . which 'aid or oppose' any religion. . . . This prohibition is absolute.' Id. at 104, 106, citing Abington School District v. Schempp, 374 U.S. 203, 225 (1963). And Justice Goldberg cogently articulated the relationship between the Establishment Clause and the Free Exercise Clause when he said that '[t]he fullest realization of true religious liberty requires that government . . . effect no favoritism among sects . . . and that it work deterrence of no religious belief.' Abington School District, 374 U.S. at 305." Larson, 456 U.S. at 246; see also Bd.

10

of Educ. of Kiryas Joel Vill. Sch. Dist. v. Grumet, 512 U.S. 687, 690 (1994); Rosenberger v. Rector & Visitors of Univ. of Va., 515 U.S. 819, 839 (1995) ("[A] significant factor in upholding governmental programs in the face of Establishment Clause attack is their neutrality towards religion."); Van Orden v. Perry, 545 U.S. 677, 684 (2005) (identifying neutrality as one of the two "faces" of the Establishment Clause).

The neutrality principle embodied in the Establishment Clause is a critical bulwark of religious freedom. The Establishment Clause and the Free Exercise Clause work together to safeguard the spiritual freedom of our people. Indeed, free exercise depends in no small measure on non-interference and non-preferential treatment by the state, and it "can be guaranteed only when legislators . . . are required to accord to their own religions the very same treatment given to small, new, or unpopular denominations." Larson, 456 U.S. at 245. Quite simply, the power, prestige, and support of the state may not be placed behind a particular religious belief. See Engel v. Vitale, 370 U.S. 421, 431 (1962). When the government "allie[s] itself with one particular form of religion, the inevitable result [is] that it . . . incur[s] the hatred, disrespect and even contempt of those who [hold] contrary beliefs." Id.

It is also by now a principle clearly embedded in our law that "when it is claimed that a denominational preference exists, the initial inquiry is whether the

11

law facially differentiates among religions." Hernandez v. Comm'r, 490 U.S. 680, 695 (1989). "[W]hen we are presented with a state law granting a denominational preference," rather than employ the three-pronged inquiry derived from Lemon v. Kurtzman, 403 U.S. 602 (1971), "we treat the law as suspect and . . . apply strict scrutiny in adjudging its constitutionality." Larson, 456 U.S. at 246. Thus, the rule, policy, or practice "must be invalidated unless it is justified by a compelling governmental interest . . . and unless it is closely fitted to further that interest." Id. at 247.

We are exceedingly loath to substitute our judgment on prison procedures for the determination of those officials charged with the formidable task of running a prison, let alone administering the death penalty in a controlled and secured manner. Nevertheless, in the face of this limited record, it looks substantially likely to us that Alabama has run afoul of the Establishment Clause of the First Amendment.

What we can say with some confidence based on what little we have seen is that Holman prison will place its Christian Chaplain in the execution chamber; that it has done so nearly uniformly for many years; that the Christian Chaplain will offer to minister to the spiritual needs of the inmate who is about to face his Maker, and that the Chaplain may pray with and touch the inmate's hand as a lethal cocktail of drugs is administered; and that only a Christian chaplain may go into

12

the death chamber and minister to the spiritual needs of the inmate, whether the inmate is a Christian, a Muslim, a Jew, or belongs to some other sect or denomination. What is central to Establishment Clause jurisprudence is the fundamental principle that at a minimum neither the states nor the federal government may pass laws or adopt policies that aid one religion or prefer one religion over another. And that, it appears to us, is what the Alabama Department of Corrections has done here.

Alabama's policy facially furthers a denominational preference. While the Alabama statute provides that only certain persons "may be present at an execution," including, among others, "[t]he spiritual advisor of the condemned," "[t]he chaplain of Holman Prison," and six relatives or friends of the condemned, Ala. Code § 15–18–83(a) (emphasis added), the statute neither requires the presence of any particular individual nor specifies whether the listed persons may be present in the execution chamber itself or only in the adjoining witness viewing room, behind two-way glass. But Alabama has told us that the inmate's spiritual advisor may observe the execution only from the witness room. Only Holman's prison Chaplain shall be in the execution chamber with the inmate. And while the state has been "willing to waive" Chaplain Summers's presence in this instance, it has not agreed to accommodate Ray by bringing his Imam into the chamber.

13

The Establishment Clause "requires that we neither abdicate our responsibility to maintain a division between church and state nor evince a hostility to religion by disabling the government from in some ways recognizing our religious heritage." Van Orden, 545 U.S. at 683–84. As Justice Douglas observed long ago, "[w]e are a religious people whose institutions presuppose a Supreme Being. We guarantee the freedom to worship as one chooses. We make room for as wide a variety of beliefs and creeds as the spiritual needs of man deem necessary." Zorach, 343 U.S. at 313. Thus it should come as no surprise that we may define ourselves in times of greatest need in reference to faith. Providing a cleric to an inmate at a spiritually critical moment by itself likely does not run afoul of the Establishment Clause. See, e.g., Cutter v. Wilkinson, 544 U.S. 709, 722 (2005) (comparing RLUIPA's protection of institutionalized persons' religious exercise to "the Federal government's accommodation of religious practice by members of the military") (citing Katcoff v. Marsh, 755 F.2d 223, 225–29 (2d Cir. 1985) (upholding the constitutionality of the military chaplaincy)).

However, we must at the same time "sponsor an attitude on the part of government that shows no partiality to any one group and that lets each flourish according to the zeal of its adherents and the appeal of its dogma." Zorach, 343 U.S. at 313. The central constitutional problem here is that the state has regularly placed a Christian cleric in the execution room to minister to the needs of Christian

14

inmates, but has refused to provide the same benefit to a devout Muslim and all other non-Christians.[3]

Alabama appears to have set up "precisely the sort of denominational preference that the Framers of the First Amendment forbade." Larson, 456 U.S. at

---

[3] Although Ray's pleadings do not clearly and precisely frame the Establishment Clause claim as denominational preference, based on everything we have seen and based on everything Ray has said, we construe it this way. At oral argument, Ray's counsel very clearly framed the Establishment Clause issue in denominational preference terms, asking, "Why does Mr. Ray not get the same benefit as a Christian, non-Catholic condemned inmate would?" and arguing that "If Mr. Ray were a standard, everyday Protestant Lutheran Christian, he would have a spiritual advisor there who could touch his hand and pray with him in his final moments. But because he happens to be a Muslim . . . [he doesn't] get that benefit." Indeed, Ray's counsel expressly cited to and quoted from the command framed by the Supreme Court in Everson that the Establishment Clause bars the state from passing "laws which aid one religion" or which "prefer one religion over another." Everson, 330 U.S. at 15. Moreover, it is clear from the colloquy that the court and the parties understood that Ray was asserting this claim, too. We add that the federal notice pleading standard only requires allegations as to every material point necessary to sustain a claim on any legal theory, even if it is not the precise theory advanced by the plaintiff. See, e.g., St. Joseph's Hosp., Inc. v. Hosp. Corp. of Am., 795 F.2d 948, 954 (11th Cir. 1986) ("The pleading 'must contain either direct allegations on every material point necessary to sustain a recovery on any legal theory, even though it may not be the theory suggested or intended by the pleader, or contain allegations from which an inference fairly may be drawn that evidence on these material points will be introduced at trial.'"); see also, e.g., Lyes v. City of Riviera Beach, 126 F.3d 1380, 1387–88 (11th Cir. 1997) (finding claim premised on the Equal Protection Clause of the Fourteenth Amendment to be sufficiently pled in complaint, although complaint mentioned only the Due Process Clause of the Fourteenth Amendment, where complaint "contain[ed] numerous allegations consistent with an equal protection cause of action"), vacated on other grounds by Lyes v. City of Riviera Beach, 166 F.3d 1332 (11th Cir. 1999) (en banc).

255.  Thus, Alabama's practice would be constitutional only if it meets the exacting standards of strict scrutiny.

Under strict scrutiny, a law that advances a denominational preference may be upheld if the government can demonstrate that the policy serves a compelling interest and that it has been narrowly tailored to further that interest.  The law is also clear that the burden falls to the government, not to the challenger, to establish a compelling interest and narrow tailoring.  See Larson, 456 U.S. at 251 ("We . . . conclude that [the government has] failed to demonstrate that the [law at issue] is 'closely fitted' to further a 'compelling governmental interest.'").  The government must carry its burden even at this preliminary stage.  That is, Ray "must be deemed likely to prevail unless the Government has shown that [his] proposed less restrictive alternatives are less effective than" the challenged procedure.  Ashcroft v. Am. Civil Liberties Union, 542 U.S. 656, 666 (2004); see also Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal, 546 U.S. 418, 429 (2006) (noting that the government's argument that plaintiff should bear the burden of disproving compelling interest at the preliminary injunction stage was "foreclosed" by the Court's decision in Ashcroft).

We do not doubt that Alabama has a powerful interest in the secure and orderly administration of the death penalty.  Indeed, "[i]t is well established that states have a compelling interest in security and order within their prisons."

16

Lawson v. Singletary, 85 F.3d 503, 512 (11th Cir. 1996) (citing Harris v. Forsyth, 735 F.2d 1235 (11th Cir. 1984)); see also Fawaad v. Jones, 81 F.3d 1084, 1087 (11th Cir. 1996) ("[M]aintaining security in a prison constitutes a compelling governmental interest.").  And the prison's concerns may be at their apex during the most consequential act of carrying out an execution.  As a general matter and at least at first blush, this seems as obvious to us as it did to the district court.  Moreover, we can imagine many practical reasons as well why Alabama may wish to provide religious support and pastoral comfort of this kind to a condemned prisoner.

As we see it, then, this case likely turns less on whether there is a compelling interest and more on whether the state's procedures are the least restrictive means or narrowly tailored to further that interest.  We acknowledge again that we owe deference to the state's assessment of its security requirements, and we are reluctant to substitute our judgment for the Commissioner's.  Cf. O'Lone v. Estate of Shabazz, 482 U.S. 342, 349 (1987) ("[W]e have often said that evaluation of penological objectives is committed to the considered judgment of prison administrators . . . .").  But we cannot simply rely on the unexplained ipse dixit of the state that there are no less restrictive means in the face of Alabama's obvious denominational preference.  To do so would ignore our constitutional obligations and the unambiguous command of the First Amendment that forbids the state from

17

putting its power, prestige, and support behind one religious belief to the exclusion of all others.  It remains the state's burden to demonstrate that there are no other less restrictive means by which to protect its interests.  See Ashcroft, 542 U.S. at 666.  And it does not jump off the page at us that there aren't other less restrictive means to accomplish its ends.  At the hearing, Ray's counsel offered that the state could readily pre-clear and pre-screen Ray's Imam -- who, after all, has already been screened and allowed regularly to visit Muslim inmates at Holman since 2015 and allowed to commune with Ray on the day of his execution, even in a holding cell next to the execution chamber.  Alabama responded simply by saying it could not do so.

This may well be true, but the bare assertion does not make it so.  Notably, Alabama did not provide the Court with any affidavit from the Warden or from any other prison official addressing in any way why there were not lesser measures available to protect its interests and provide the same faith-based benefits to Christians and non-Christians alike.  Nor did Alabama offer anything from its Chaplain or from anyone else about the perceived risks or the things that a cleric might need to learn in order to undertake this solemn and sensitive task.  Alabama has presented us with nothing in support of its claims.

As the district court recognized, the proper determination of this significant Establishment Clause claim will turn on critical facts that have not been presented

18

to us on this barren record.  Among other things, these facts may include the nature

of the risk posed by allowing another cleric into the execution chamber, whether

the state can screen, pre-clear and train other clerics, how difficult and time

consuming that may be, and whether it could do so while meeting its obviously

significant interest in maintaining security in the execution chamber.  All we can

say at this stage -- indeed what we are obliged to say -- is that Alabama's prison

officials apparently have favored one religious denomination to the detriment of all

others, that they have made only general claims about their compelling interest,

and that they have offered nothing remotely establishing that their policy is

narrowly tailored to further that interest.

    We add that the trial judge never addressed the merits of Ray's

Establishment Clause claim, suggesting only that the state's agreement to remove

the Chaplain mooted the question.[4]  This rationale misapprehends the nature of

---

[4] In its mootness analysis, the district court relied on a footnote in Ray's complaint, which represented that the Establishment Clause claim "[would] be moot if Mr. Ray prevails on Claims One and/or Two."  While the phrasing of this footnote is undoubtedly inartful, we are not bound by the parties' jurisdictional representations. See Jackson v. Seaboard Coast Line R.R. Co., 678 F.2d 992, 1000–01 (11th Cir. 1982) ("The jurisdiction of a court over the subject matter of a claim involves the court's competency to consider a given type of case and cannot be waived or otherwise conferred upon the court by the parties." (footnote omitted)).  Nor do we find as much clarity in the footnote as the district court did.  Ray sought two distinct forms of relief: the presence of a Muslim spiritual advisor as he was about to die and the exclusion of the prison's Christian Chaplain.  The state gave him only half.  His claim therefore is not moot.  See De La Teja v. United States, 321 F.3d 1357, 1364 (11th Cir. 2003) ("This remains a live controversy as to which we could provide

Ray's Establishment Clause claim.  Waiving the presence of the Christian Chaplain, while still refusing admission to Ray's Imam has provided Ray with only half of the relief he seeks; it does nothing to alleviate the core Establishment Clause problem.  If Ray were a Christian, he would have a profound benefit; because he is a Muslim, he is denied that benefit.

Ray's claim may well fit under the rubric of RLUIPA as well, though it seems to us more naturally framed by the Establishment Clause.[5]  Notably, RLUIPA defines a substantial burden on free exercise in the broadest of terms -- much broader than the Supreme Court's First Amendment jurisprudence it responded to.  Indeed, as the Supreme Court has noted, "in an obvious effort to effect a complete separation from First Amendment case law, Congress deleted the reference to the First Amendment [in RLUIPA] and defined the 'exercise of

---

meaningful relief, and accordingly the issue is not moot.") (citing Al Najjar v. Ashcroft, 273 F.3d 1330, 1336 (11th Cir. 2001)).

[5] RLUIPA provides in pertinent part:

> No government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution . . . even if the burden results from a rule of general applicability, unless the government demonstrates that imposition of the burden on that person —
>
> > (1) is in furtherance of a compelling governmental interest; and
> >
> > (2) is the least restrictive means of furthering that compelling governmental interest.

42 U.S.C. § 2000cc-1(a).

religion' to include 'any exercise of religion, whether or not compelled by, or central to, a system of religious belief.'"  Burwell v. Hobby Lobby Stores, Inc., 134 S. Ct. 2751, 2761–62 (2014) (emphasis added) (quoting 42 U.S.C. § 2000cc-5(7)(A)).  Moreover, in addition to including this "capacious" definition of religious exercise, Congress expressly mandated that the statute "shall be construed in favor of a broad protection of religious exercise, to the maximum extent permitted by the terms of this chapter and the Constitution."  42 U.S.C. § 2000cc-3(g); see also Holt v. Hobbs, 135 S. Ct. 853, 860 (2015).

It may be that denying access to a Muslim cleric at the moment of death would impose a substantial burden.  We need not reach that question now, but we highlight that RLUIPA's strict scrutiny would -- just like in the Establishment Clause context -- squarely place the burden on the government to demonstrate that its policy is narrowly tailored to serve a compelling governmental interest.  Moreover, under RLUIPA's compelling interest and least restrictive means analysis, the statute "does not permit . . . unquestioning deference" to the government's assessment, Holt, 135 S. Ct. at 864, and Congress expressly envisioned that the statute "may require a government to incur expenses in its own operations to avoid imposing a substantial burden on religious exercise," 42 U.S.C. § 2000cc-3(c).  See also Holt, 135 S. Ct. at 860; Hobby Lobby, 134 S. Ct. at 2781.

21

Although the district court briefly evaluated the RLUIPA claim on the merits, it failed to grapple with any of these principles. The district court also improperly shifted the burdens surrounding compelling interest and least restrictive means onto Ray. After first recognizing that RLUIPA places these burdens on the government, it found in its application of the law to this case that "Ray has not shown that it is substantially likely that the State lacks a compelling interest or that the State could use a less-restrictive means of furthering its interest," and that "Ray has not shown that it is substantially likely that the State could further its interest while allowing untrained, 'free world' spiritual advisors be in the death chamber." While the burden of persuasion rests with the petitioner to show a substantial likelihood of success on the merits, once he has made a prima facie showing of denominational preference, Ashcroft and Gonzales make clear, as do the words of RLUIPA, that even at a preliminary stage, it is the government's burden to establish that there are no less restrictive means to adequately address its important interest. At the end of the day, it is possible that there are no less restrictive means, but the government must show us how and why that is so. Whether Ray's claim is framed as arising under the Establishment Clause or RLUIPA, the burden rests with Alabama, not Ray, to show a compelling interest and the adoption of means closely fitted to that interest.

22

Faced with this substantial Establishment Clause claim, and with precious little in the record to support the government's interests and the fit between those interests and the state's policy, we are required to conclude, as we do, that Ray is substantially likely to succeed on the merits.

B.

The remainder of the factors we apply when considering a stay amount to a weighing of the equitable interests of the petitioner, the government, and the public.  See Arthur, 840 F.3d at 1321 (requiring the moving party to establish "irreparable injury," lack of "substantial[] harm [to] the other litigant," and that "the injunction would not be adverse to the public interest").  In this case, the equities fall as they often do in death cases, with the petitioner arguing that "he will suffer irreparable harm if he is executed" in an unconstitutional manner while the state risks only the "minimal inconvenience" of delay.  Brooks, 810 F.3d at 825.  In the absence of a stay, Ray will die without the benefit, available to Christian inmates, of sharing his final moments with a cleric who shares his faith and who will be able to provide prayer, spiritual support and comfort at the moment of death.  Moreover, the public has a serious interest in the proper application and enforcement of the Establishment Clause and RLUIPA.

On the other hand, "as the Supreme Court has recognized, the state, the victim, and the victim's family also 'have an important interest in the timely

23

enforcement of [the inmate's] sentence.'" Id. (quoting Hill v. McDonough, 547 U.S. 573, 584 (2006)); see also Hill, 547 U.S. at 584 ("[E]quity must be sensitive to the State's strong interest in enforcing its criminal judgments without undue interference from the federal courts."). Of course, neither Alabama nor the public has any interest in carrying out an execution in a manner that violates the command of the Establishment Clause or the laws of the United States.

The district court makes much of the fact that Ray's claims have been brought too close to the scheduled date for Ray's execution. It stresses that we must consider "the extent to which the inmate has delayed unnecessarily in bringing the claim," Nelson v. Campbell, 541 U.S. 637, 649–50 (2004), and identifies "a strong equitable presumption against the grant of a stay where a claim could have been brought at such a time as to allow consideration of the merits without requiring entry of a stay," Hill, 547 U.S. at 584 (quoting Nelson v. Campbell, 541 U.S. 637, 650 (2004)); Grayson v. Allen, 491 F.3d 1318, 1322 (11th Cir. 2007). We agree as a matter of doctrine, but the district court seems to have overlooked a key point: That the claim was brought at the last minute does not necessarily establish that it was brought in a dilatory manner.

In other cases, we have suggested that the equities may tend to weigh against a stay when there has been no explanation offered why a § 1983 suit was brought at the eleventh hour to challenge policies that had long been in place. E.g.,

24

Rutherford v. McDonough, 466 F.3d 970, 974–76 (11th Cir. 2006) (dismissing challenge to lethal injection protocols on equitable grounds based on delay, considering that the petitioner had raised identical claims in state court a month prior, and that others had challenged the protocols in state court over five years earlier); see also Powell v. Thomas, 643 F.3d 1300, 1305 (11th Cir. 2011) (finding that the § 1983 statute of limitations begins running when "the facts supporting th[e] cause of action 'should have been apparent to any person with a reasonably prudent regard for his rights'") (quoting McNair v. Allen, 515 F.3d 1168, 1177 (11th Cir. 2008)); Arthur v. King, 500 F.3d 1335, 1341–42 (11th Cir. 2007) (denying a stay and dismissing a § 1983 suit to obtain evidence for DNA testing in part because the claim had been available "through a § 1983 action for at least five years").

Here, however, arguments suggesting unreasonable delay on Ray's part are far less compelling.  For starters, a review of the relevant statutory text would not have put Ray or his lawyers on notice that the institution's Christian Chaplain would always be present in the execution chamber or that Ray's Imam could never be.  The Alabama Code only says that certain persons "may be present at an execution"; it does not say that the Chaplain will be present.  Ala. Code § 15–18–83(a) (emphasis added).  It lists both the Chaplain and "[t]he spiritual advisor of the condemned" as among those who "may be present," without drawing any

25

distinction between where these two individuals will be situated during the execution. Id. Nor does the statute distinguish between the execution chamber and the witness viewing room, nor, finally, does it say anything about whether the Chaplain may have contact with the inmate at the critical moment. Id. Even the most careful review of the statute by Ray or his lawyers would not have revealed that the prison's Christian Chaplain will stand in the execution chamber while any other spiritual advisor, relatives or friends, and members of the press are in a separate room.

On January 23, only after Ray requested and was denied a religious accommodation, he asked the Warden and the Chaplain to see the prison's policies requiring that Holman's prison Chaplain, and only the prison Chaplain, would be placed in the execution chamber during an execution; he was told that he could not see Alabama's written policy. There is little reason, then, to think that he must have known the contents of these confidential policies at an earlier date. Indeed, the fact that these procedures have been filed thoroughly redacted and under seal is a further indication that Alabama's execution procedures are closely guarded by the ADOC.

Thus we are left with only the suggestion that he must have known ADOC policies from an earlier date because he sat on death row for a lengthy period of time. But the state has provided no evidence that Ray would have learned at any

26

point about these polices or that he could have filed a lawsuit challenging these policies any earlier than he did.  According to Ray -- and it is unrebutted on this record -- he first requested and was denied accommodations based on his religion on January 23.  He filed his complaint in district court on January 28, just five days later (including two days which fell over a weekend).  The state has not provided us with any evidence that Ray knew or should have known that his religious beliefs would not be accommodated prior to January 23, or that he had any opportunity to request an accommodation prior to that date.

Given the paucity of evidence, it is not altogether surprising that the state has not even clearly argued that Ray knew or should have known sooner that his religious beliefs would not be accommodated.  The state argued before the district court only at the highest order of abstraction that "Mr. Ray is responsible for the delay" because "[c]ertainly Mr. Ray could have pursued this claim or pursued his desire to have a private spiritual advisor at an earlier time."  To support these claims, the state offers only the barest assertions about common knowledge in the prison.  Even if we were to assume that some prisoners on death row are aware that the prison Chaplain has been present in the execution chamber in the past, there is not much else to support the inference that Ray knew or should have known that the Chaplain's presence was required, let alone that he should have known his request for an imam would be denied.  The state has not suggested that any non-

27

Christian prisoners, like Ray, have requested or been denied an accommodation in the past in a manner that might even arguably have placed someone like Ray on notice. Nor has the state suggested that its confidential procedures, filed under seal with the district court, might have provided any other inmate with any notice. The state has not suggested that these procedures were made available to anyone.

The long and short of it is that Ray has provided an altogether plausible explanation for why the claims were not filed in district court sooner and the state has neither argued nor produced any evidence that the petitioner was aware that the claims were available at an earlier date.

As we see it, the equities weigh in favor of granting a stay.

Based on the foregoing analysis, Ray's petition for an emergency stay of execution is GRANTED. The Clerk of Court is directed to EXPEDITE this appeal so that we may promptly resolve these claims.