Justice SOTOMAYOR, dissenting.
As I have maintained ever since the Court started down this wayward path in Glossip v. Gross , 576 U.S. ----, 135 S.Ct. 2726, 192 L.Ed.2d 761 (2015), there is no sound basis in the Constitution for requiring condemned inmates to identify an available means for their own executions. Justice BREYER ably explains why today's extension of Glossip 's alternative-method requirement is misguided (even on that precedent's own terms), and why (with or without that requirement) a trial is needed to determine whether Missouri's *1146 planned means of executing Russell Bucklew creates an intolerable risk of suffering in light of his rare medical condition. I join Justice BREYER's dissent, except for Part III. I write separately to address the troubling dicta with which the Court concludes its opinion.
I
Given the majority's ominous words about late-arising death penalty litigation, ante, at 1133 - 1134, one might assume there is some legal question before us concerning delay. Make no mistake: There is not. The majority's commentary on once and future stay applications is not only inessential but also wholly irrelevant to its resolution of any issue before us.
The majority seems to imply that this litigation has been no more than manipulation of the judicial process for the purpose of delaying Bucklew's execution. Ante, at 1133 - 1134. When Bucklew commenced this case, however, there was nothing "settled," ibid. , about whether the interaction of Missouri's lethal-injection protocol and his rare medical condition would be tolerable under the Eighth Amendment. At that time, Glossip had not yet been decided, much less extended to any as-applied challenge like Bucklew's. In granting prior stay requests in this case, we acted as necessary to ensure sufficient time for sober review of Bucklew's claims. The majority laments those decisions, but there is nothing unusual-and certainly nothing untoward-about parties pressing, and courts giving full consideration to, potentially meritorious constitutional claims, even when those claims do not ultimately succeed.
II
I am especially troubled by the majority's statement that "[l]ast-minute stays should be the extreme exception," which could be read to intimate that late-occurring stay requests from capital prisoners should be reviewed with an especially jaundiced eye. See ante, at 1134. Were those comments to be mistaken for a new governing standard, they would effect a radical reinvention of established law and the judicial role.
Courts' equitable discretion in handling stay requests is governed by well-established principles. See Nken v. Holder , 556 U.S. 418, 434, 129 S.Ct. 1749, 173 L.Ed.2d 550 (2009). Courts examine the stay applicant's likelihood of success on the merits, whether the applicant will suffer irreparable injury without a stay, whether other parties will suffer substantial injury from a stay, and public interest considerations. Ibid .
It is equally well established that "[d]eath is a punishment different from all other sanctions in kind rather than degree." Woodson v. North Carolina , 428 U.S. 280, 303-304, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976). For that reason, the equities in a death penalty case will almost always favor the prisoner so long as he or she can show a reasonable probability of success on the merits. See Nken , 556 U.S. at 434, 129 S.Ct. 1749 (noting that success on the merits and irreparable injury "are the most critical" factors); cf. Glossip , 576 U.S., at ----, 135 S.Ct., at 2737 (observing, in a preliminary-injunction posture, that "[t]he parties agree that this case turns on whether petitioners are able to establish a likelihood of success on the merits" and analyzing the case accordingly); accord, id ., at ----, 135 S.Ct., at 2792 (SOTOMAYOR, J., dissenting). This accords with each court's " 'duty to search for constitutional error with painstaking care' " in capital cases. Kyles v. Whitley , 514 U.S. 419, 422, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995).
*1147 It is of course true that a court may deny relief when a party has "unnecessarily" delayed seeking it, Nelson v. Campbell , 541 U.S. 637, 649-650, 124 S.Ct. 2117, 158 L.Ed.2d 924 (2004), and that courts should not grant equitable relief on clearly " 'dilatory,' " " 'speculative,' " or meritless grounds, ante , at 1134 (quoting Hill v. McDonough , 547 U.S. 573, 584-585, 126 S.Ct. 2096, 165 L.Ed.2d 44 (2006) ); see also Gomez v. United States Dist. Court for Northern Dist. of Cal. , 503 U.S. 653, 654, 112 S.Ct. 1652, 118 L.Ed.2d 293 (1992) (per curiam ) (vacating a stay where an inmate's unjustified 10-year delay in bringing a claim was an "obvious attempt at manipulation"). That is hardly the same thing as treating late-arising claims as presumptively suspect.[1]
The principles of federalism and finality that the majority invokes are already amply served by other constraints on our review of state judgments-most notably the Antiterrorism and Effective Death Penalty Act of 1996, but also statutes of limitations and other standard filters for dilatory claims. We should not impose further constraints on judicial discretion in this area based on little more than our own policy impulses. Finality and federalism need no extra thumb on the scale from this Court, least of all with a human life at stake.
The only sound approach is for courts to continue to afford each request for equitable relief a careful hearing on its own merits. That responsibility is never graver than when the litigation concerns an impending execution. See, e.g., Kyles , 514 U.S. at 422, 115 S.Ct. 1555 ; Woodson , 428 U.S. at 303-304, 96 S.Ct. 2978. Meritorious claims can and do come to light even at the eleventh hour, and the cost of cursory review in such cases would be unacceptably high. See Glossip , 576 U.S., at ---- - ----, 135 S.Ct., at 2766 (BREYER, J., dissenting) (collecting examples of inmates who came "within hours or days of execution before later being exonerated"). A delay, moreover, may be entirely beyond a prisoner's control. Execution methods, for example, have been moving targets subject to considerable secrecy in recent years, which means that constitutional concerns may surface only once a State settles on a procedure and communicates its choice to the prisoner.[2] In other contexts, too, fortuity or the imminence of an execution may *1148 shake loose constitutionally significant information when time is short.[3]
There are higher values than ensuring that executions run on time. If a death sentence or the manner in which it is carried out violates the Constitution, that stain can never come out. Our jurisprudence must remain one of vigilance and care, not one of dismissiveness.

A skewed view of the facts caused the majority to misapply these principles and misuse its "equitable powers," see ante, at 1134, and n. 5, in vacating the Court of Appeals' unanimous stay in Dunn v. Ray , 586 U.S. ----, 139 S.Ct. 661, --- L.Ed.2d ---- (2019). Even today's belated explanation from the majority rests on the mistaken premise that Domineque Ray could have figured out sooner that Alabama planned to deny his imam access to the execution chamber. But see id., at ----, 139 S.Ct., at 662 (KAGAN, J., dissenting) (noting that the governing statute authorized both the inmate's imam and the prison's Christian chaplain to attend the execution, and that "the prison refused to give Ray a copy of its own practices and procedures" that would have clarified the two clergymen's degrees of access); Ray v. Commissioner, Ala. Dept. of Corrections , 915 F.3d 689, 701-703 (CA11 2019).

See Zagorski v. Parker , 586 U.S. ----, ---- - ----, 139 S.Ct. 11, 202 L.Ed.2d 258 (2018) (SOTOMAYOR, J., dissenting from denial of application for stay and denial of certiorari) (describing Tennessee's recent equivocation about the availability of its preferred lethal injection protocol); Glossip , 576 U.S., at ----, 135 S.Ct., at 2796 (SOTOMAYOR, J., dissenting) (noting States' "scramble" to formulate "new and untested" execution methods); Sepulvado v. Jindal , 739 F.3d 716, 717-718 (CA5 2013) (Dennis, J., dissenting from denial of rehearing en banc) (describing Louisiana's refusal to inform a prisoner of the drugs that would be used to execute him); Denno, Lethal Injection Chaos Post-Baze , 102 Geo. L.J. 1331, 1376-1380 (2014) (describing increased secrecy around execution procedures).

See Connick v. Thompson , 563 U.S. 51, 55-56, and n. 1, 131 S.Ct. 1350, 179 L.Ed.2d 417 (2011) (intentionally suppressed exculpatory crime lab report discovered a month before a scheduled execution); Ex parte Braziel , No. WR-72,186-01 (Tex. Crim. App., Dec. 11, 2018), pp. 1-2 (Alcala, J., dissenting) (disclosure by the State of "new information about possible prosecutorial misconduct" the same day as an execution).