[PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

————————————————

No. 23-12242

Non-Argument Calendar

————————————————

JAMES EDWARD BARBER,

Plaintiff-Appellant,

*versus*

GOVERNOR OF THE STATE OF ALABAMA,
COMMISSIONER, ALABAMA DEPARTMENT OF
CORRECTIONS,
WARDEN, HOLMAN CORRECTIONAL FACILITY,
ATTORNEY GENERAL, STATE OF ALABAMA,
JOHN DOE 1,
JOHN DOE 2,
JOHN DOE 3,

Defendants-Appellees.

———————————

Appeal from the United States District Court
for the Middle District of Alabama
D.C. Docket No. 2:23-cv-00342-ECM

———————————

Before JILL PRYOR, BRANCH, and LUCK, Circuit Judges.

BRANCH, Circuit Judge:

James Edward Barber is an Alabama death row inmate scheduled to be executed by lethal injection on July 20, 2023. On May 25, 2023, Barber filed a 42 U.S.C. § 1983 complaint asserting that the manner in which Alabama executes its lethal injection protocol violates the Eighth Amendment's prohibition against cruel and unusual punishments. Specifically, he takes issue with the manner in which the execution team attempted to secure IV access[1] in the inmates during the preceding three executions that

---

[1] It is undisputed that a central component of Alabama's lethal injection protocol is establishing IV access to the inmate's veins so that the necessary drugs can be administered. *See* Redacted Execution Procedures (March 2023) ANNEX C (attached as Exhibit B to complaint). The protocol requires that "two (2) intravenous infusion devices [be] placed in veins of the condemned inmate" by the "IV Team." *Id.* All members of the IV Team must "be currently certified or licensed within the United States." *Id.* The protocol further provides that "[t]he standard procedure for inserting IV access will be used. If the condemned inmate's veins make obtaining venous access difficult

occurred in 2022, two of which were canceled due to the execution team's inability to secure the necessary IV access after making numerous attempts over an extended period of time. Despite the fact that Alabama has since conducted a full review of its execution procedures, Barber maintains that there is no evidence that the issues "that derailed the prior executions" have been fixed, and that he is at substantial risk of serious harm and "torture" because he "will likely be repeatedly punctured for hours with needles all over his body" while the execution team attempts to gain IV access.

Relatedly, Barber filed a motion for a preliminary injunction on the same grounds seeking to enjoin Alabama from executing him by any method other than nitrogen hypoxia.[2] Following additional briefing and an evidentiary hearing, the district court denied the motion.

---

or problematic, qualified medical personnel may perform a central line procedure to obtain venous access." *Id.*

[2] In 2018, Alabama added nitrogen hypoxia as a statutorily available execution method. *See* Ala. Code § 15-18-82.1(a) (2018). Barber acknowledges that inmates like himself who were sentenced prior to this statutory change were given a window of time in which to elect nitrogen hypoxia as their method of execution, and it is undisputed that Barber did not elect this option during the designated time frame. Alabama law provides that where, as here, an inmate fails to elect nitrogen hypoxia as their method of execution within the designated time frame, he waives the election. *Id.* § 15-18-82.1(b)(2). Nevertheless, Barber asserts that nitrogen hypoxia is an available alterative for purposes of his Eighth Amendment claim, and the State does not contest this assertion on appeal. Accordingly, for purposes of this appeal, we accept that notwithstanding Barber's failure to timely elect nitrogen hypoxia as his method of execution, it is an available alternative in this case.

Barber appeals the denial of that motion,[3] arguing that the district court abused its discretion in denying his motion because it clearly erred (1) in finding that he was not likely to succeed on his claim; (2) in finding that his claim was speculative; (3) in crediting the last-minute affidavit of Warden Terry Raybon; and (4) in finding that certain aspects of his claim were time-barred. After review and with the benefit of oral argument, we affirm.

## I.    Facts and Procedural History

Barber was convicted of the 2001 murder of Dorothy Epps. *Barber v. Comm'r, Ala. Dep't of Corr.*, 861 F. App'x 328, 329–30 (11th Cir. 2021), *cert. denied* 142 S. Ct. 1379 (2022). Barber knew his victim. *Id.* He had performed repair work on her home and "had a social relationship" with one of Epps's daughters. *Id.* at 330. At the advanced age of 75, Epps was murdered in her home after Barber, in an apparent attempt to rob her,[4] "struck [her] in the face with his fist, and at some point thereafter, obtained a claw hammer that he used to cause multiple blunt force injuries." *Id.* Epps's death was not a quick one—the autopsy revealed "bruises, cuts and fractures, bleeding over the brain, multiple injuries in [her] hand

---

[3] Barber has also filed an accompanying motion for stay of execution in this Court.

[4] Barber confessed to police, "admitting that he struck Mrs. Epps with a claw hammer, grabbed her purse, and ran out of the house." *Barber v. State*, 952 So. 2d 393, 402 (Ala. Crim. App. 2005). "There was no evidence of a forced entry by [Barber] into the Epps home, and it is more likely than not that [he] gained access to the home easily because of his acquaintance with Mrs. Epps." *Id.* at 401.

and arms, rib fractures and bruising in the front of her body, and bruising and rib fractures in the back of the body," as well as "nineteen different lacerations in the head and seven fractures in the head or skull, injuries to the neck and mouth and left eye . . . and her tongue was bruised and injured from a blow or blows to the head." *Id.* Evidence established that the attack "occurred over several parts of [her] house," and she had numerous defensive wounds from where she had tried to protect herself from the blows Barber inflicted. *Id.* The medical examiner testified that she would have been conscious when she received the injuries and defensive wounds. *Id.* at 331. The jury recommended 11 to 1 that Barber be sentenced to death, and the trial court followed that recommendation.[5] *Id.* at 333.

The Alabama Court of Criminal Appeals affirmed his conviction and sentence. *Barber v. State*, 952 So. 2d 393, 464 (Ala. Crim. App. 2005). The United States Supreme Court denied his petition for a writ of certiorari. *Barber v. Alabama*, 549 U.S. 1306 (2007). Following his direct appeal, Barber exhausted fully both his state and federal avenues for habeas relief. *See Barber*, 861 F. App'x at 333–37.

In February 2023, the State moved the Alabama Supreme Court to set an execution date for Barber, which the court granted, and Alabama Governor Kay Ivey set Barber's execution date for

---

[5] The trial court found two aggravating circumstances: (1) that the murder was committed during a robbery and (2) that the murder was especially heinous, atrocious, or cruel. *Barber*, 861 F. App'x at 333.

23-12242                Opinion of the Court                6

July 20, 2023, beginning at 12:00 a.m. and expiring at 6:00 a.m. on July 21, 2023.

On May 25, 2023, Barber filed the underlying § 1983 complaint raising his Eighth Amendment challenge to his execution by lethal injection. Eleven days later, on June 5, 2023, Barber filed a motion for a preliminary injunction, seeking to enjoin his execution by lethal injection. Barber's motion focused on the three allegedly "botched" execution proceedings performed by Alabama in 2022 due to protracted, repeated attempts to obtain IV access in the condemned inmate. The first of these execution proceedings was that of Joe Nathan James in July 2022. According to Barber, the IV Team in James's case tried to access James's veins for more than three hours, puncturing various places on James's body. Then, so Barber argues, unable to obtain IV access, the IV Team sedated James and performed a "cut-down" procedure[6] to try to obtain a vein.[7] When the public curtain opened, James

---

[6] In the context of another challenge to execution methodology, we explained that a "cut-down" procedure involves "making a deep incision into the subject's skin to find a blood vessel, which is then cut open to allow for the insertion of a catheter." *Nance v. Comm'r, Ga. Dep't of Corr.*, 59 F.4th 1149, 1156 (11th Cir. 2023) (quotations omitted).

[7] As noted at Barber's evidentiary hearing, two different doctors conducted an autopsy on James and reached different conclusions. One autopsy found only two confirmed puncture marks, "no signs of torture or other abuse," no evidence of sedation, and no evidence of a cut-down procedure. Another found multiple needle marks on various parts of James's body, and evidence of "[l]inear superficial abrasions" on the "left antecubital fossa and proximal forearm," measuring only "1 ¾ inches in length and less than $1/16$ inch in depth." The district court found that based on these reports Barber's

appeared already unconscious, and soon after officials pronounced him dead. The second execution proceeding cited by Barber was that of Alan Eugene Miller in September 2022. During this proceeding, the IV Team attempted unsuccessfully for approximately 90 minutes to obtain IV access, "slapping" and puncturing both of Miller's elbows, his right hand and foot, and right and left arms. [*Id.*] Barber included an affidavit from Miller in which Miller asserted that the process caused him extreme physical and psychological pain and suffering.[8] Ultimately, Miller's execution was called off because the team was not able to obtain IV access within the execution window.[9] Finally, the third execution proceeding was that of Kenneth Smith in November 2022. According to Barber, the IV Team spent over two hours

---

"[a]llegations of a cut-down on James" and his allegations of sedation "[were] not borne out by either autopsy."

[8] Miller maintained that he "could feel the needle being injected into [his] skin, and then turned in various directions" in the IV Team's attempts to find a vein. He stated that he "could feel [his] veins being pushed around inside [his] body by needles, which caused him great pain and fear." And when the IV Team attempted to insert a needle into Miller's right foot, it "caused sudden and severe pain" and "felt like [he] ha[d] been electrocuted in [his] foot."

[9] As the district court noted, the Alabama Department of Corrections ("ADOC") had a shorter window in which to complete Miller's execution because Miller had pending litigation in federal court seeking to enjoin ADOC from executing him, which was not resolved until around 9:00 p.m. on the evening of his set execution with the window expiring at midnight.

attempting to obtain IV access in Smith before calling off the execution due to the inability to set IV lines.[10]

Following the issues in Smith's attempted execution, Governor Ivey asked Alabama's Attorney General Steve Marshall to withdraw then-pending motions with the Alabama Supreme Court to set execution dates[11] for other death row inmates, and for the Alabama Department of Corrections ("ADOC") to conduct a full review of the State's execution process.

Barber acknowledged in his motion for a preliminary injunction that the ADOC conducted a review of its execution processes and procedures between November 2022 and late February 2023,[12] although he took issue with the length of the

---

[10] Barber also submitted an affidavit from Smith, who stated generally that "ADOC's unsuccessful attempts to establish [IV] access caused [him] severe physical pain and emotional trauma as described" in a complaint Smith filed in pending litigation of his own. Additionally, as in Miller's case, the ADOC also had a shorter window in which to complete Smith's execution because Smith also had pending litigation in federal court seeking to enjoin his execution that was not resolved until 10:20 p.m. on the evening of his set execution.

[11] At that time, Barber was one of the condemned inmates for which the State had a pending motion to set an execution date. Following the Governor's order, the State withdrew that motion.

[12] On February 24, 2023, the Commissioner for the ADOC, John Hamm, notified Governor Ivey that:

> [ADOC had] conducted an in-depth review of [the ADOC's] execution process that included evaluating: the Department's legal strategy in capital litigation matters, training procedures for Department staff and medical personnel involved in

executions, increasing the number of personnel utilized by the Department for executions, assisting medical personnel participating in the process, and the equipment on-hand to support the individuals participating in the execution. During our review, Department personnel communicated with corrections personnel responsible for conducting executions in several other states. Our review also included thorough reviews of execution procedures from multiple states to ensure that our process aligns with the best practices in other jurisdictions.

After discussing the matter with my staff, I am confident that the Department is as prepared as possible to resume carrying out executions consistent with the mandates of the Constitution. This is true in spite of the fact that death row inmates will continue seeking to evade their lawfully imposed death sentences.

. . .

The Department has also decided to add to its pool of available medical personnel for executions. The vetting process for these new outside medical professionals will begin immediately.

. . .

Finally, Department personnel have conducted multiple rehearsals of our execution process in recent months to ensure that our staff members are well-trained and prepared to perform their duties during the executions process.

Following receipt of this letter, Governor Ivey cleared Commissioner Hamm to move forward with scheduling executions for eligible death row inmates. The State then filed a motion with the Alabama Supreme Court to set an execution date for Barber.

investigation and the manner in which it was conducted. Barber asserted that the investigation did not resolve the issues plaguing Alabama's lethal injection protocol and the manner in which Alabama carries out the protocol. He maintained that "he [would] likely be subject to the same grisly fate" as James, Miller, and Smith "because [ADOC] ha[d] not made any meaningful changes to their defective [lethal injection] [p]rotocol" and "[t]he IV Team is still insufficiently credentialed." He asserted that a viable, less painful alternative method of execution was available—namely, nitrogen hypoxia. Accordingly, he requested that the district court enjoin Alabama from executing him by lethal injection.

Following the State's motion in opposition to the preliminary injunction and Barber's reply, the district court conducted an evidentiary hearing on the motion. Thereafter, the district court denied Barber's motion. First, the district court addressed the State's assertion that Barber's claims were time-barred and concluded that "to the extent Barber claim[ed] that specific provisions of the [lethal injection] protocol violate[d] the Eighth Amendment," his claims were barred by the two-year statute of limitations because "[t]he alleged deficiencies in the [lethal injection] [p]rotocol about which Barber complain[ed] ha[d] been present since the last significant change" to the protocol, which was over two years ago.[13] However, the court concluded

---

[13] We agree with the district court that Barber's challenges to specific aspects of Alabama's lethal injection protocol are time-barred because they accrued over two years ago. Specifically, no one disputes that there has been no substantial change to the medical process outlined in the execution protocol

that Barber's as-applied Eighth Amendment challenge to the manner in which Alabama carries out the protocol—"through an emerging pattern of prolonged attempts to establish IV access"—was timely.

The district court then explained that to obtain a preliminary injunction, Barber bore the burden to demonstrate that he has a substantial likelihood of success on the merits of his claim. To succeed on the merits, Barber had to (1) establish that he faced a substantial risk of serious harm from the challenged method of execution, and (2) identify an alternative feasible method of execution that would significantly reduce the substantial risk of severe pain. The district court found that he had satisfied the second element by "successfully identify[ing] nitrogen hypoxia as a feasible, readily implemented alternative method of execution." Accordingly, the district court focused its analysis on whether Barber met his burden to show that he faces a substantial risk of serious of harm if executed by lethal injection.

The district court noted that in *Smith v. Commissioner, Alabama Department of Corrections*, No. 22-13781, 2022 WL 17069492 (11th Cir. Nov. 17, 2022), *cert. denied sub. nom. Hamm v. Smith*, 143 S. Ct. 1188 (2023), we concluded in an unpublished opinion that,

---

in the last two years, and that the applicable statute of limitations is two years. *Brooks v. Warden*, 810 F.3d 812, 823 (11th Cir. 2016). Thus, to the extent that Barber takes issue with the protocol itself or the alleged lack of clarity or definitions in the protocol, those deficiencies have been present in the protocol since the last substantial change more than two years ago, and his claims are time-barred.

based on the ADOC's pattern of difficulty in obtaining IV access, and the condemned inmate's specific risk factors related to certain medical conditions, the condemned inmate had plausibly pleaded an Eighth Amendment claim for purposes of surviving a motion to dismiss and the district court should have granted him leave to amend his complaint. However, the district court also noted that in *Nance v. Commissioner, Georgia Department of Corrections*, 59 F.4th 1149, 1157 (11th Cir. 2023), we rejected a condemned inmate's Eighth Amendment claim based on allegations that futile attempts to locate a condemned inmate's veins would give rise to an unconstitutional level of pain. The district court then concluded that Barber's case was distinguishable from *Smith* and more like *Nance*. Specifically, the district court concluded that "intervening actions have disrupted the pattern discussed in *Smith*," noting that the ADOC had conducted an investigation, determined that there were no deficiencies in the protocol itself, and implemented IV Team "personnel changes." Indeed, evidence presented during the evidentiary hearing established that "[n]one of the members of the current IV [T]eam were involved in the previous three execution attempts." Furthermore, the State had since amended its procedural rules to provide for a longer time frame for executions than it had before.[14] Thus, Barber could not "show that the

---

[14] While the ADOC's investigation was pending, Governor Ivey requested that the Alabama Supreme Court amend Alabama Rule of Appellate Procedure 8(d)(1), which at that time provided that "[t]he supreme court shall at the appropriate time enter an order fixing a date of execution." *See* Ala. R. App. P. 8(d)(1) (1997). Governor Ivey explained that the "execution date" in the

investigation and corresponding changes [would] not address the pattern of prolonged efforts to obtain IV access" identified in *Smith*. Accordingly, "[i]n light of the investigation conducted by the ADOC, and [the] actions taken as a result thereof," the district court found that "Barber's allegations [were] too speculative to give rise to an Eighth Amendment claim upon which he [would be] substantially likely to prevail."

Additionally, the district court found that, unlike the condemned inmate in *Smith*, Barber made "no allegation in his complaint that he has a specific, physical condition or infirmity that makes it more difficult to access his veins." And although Barber testified at the hearing that the ADOC had difficulty on occasion

---

rule encompassed "a single-24 hour period," meaning that ADOC had to call off execution attempts at midnight on the set day. This requirement, coupled with ADOC's execution protocol that required that executions not start until 6:00 p.m. and last-minute appeals by the condemned inmate which often pushed the start time even later, created a "time crunch" for the completion of all of the necessary execution processes and procedures. Accordingly, Governor Ivey requested that Rule 8 be amended to allow for a longer time period of time, consistent with longer time periods provided for in some other states. Upon consideration, the Alabama Supreme Court amended Rule 8 so that it now provides that "[t]he supreme court shall at the appropriate time enter an order authorizing the Commissioner of the Department of Corrections to carry out the inmate's sentence of death within a time frame set by the governor." Ala. R. App. P. 8(d)(1) (2023). Consistent with the new rule, Governor Ivey set Barber's execution time frame "to occur beginning at 12:00 a.m. on Thursday, July 20, 2023, and expiring at 6:00 a.m. on Friday, July 21, 2023."

23-12242                Opinion of the Court                14

accessing his veins,[15] he also testified that the ADOC had been able to access his veins without issue in other instances. Thus, Barber failed to establish that he presented individualized risks that would complicate IV access. The district court also concluded that Barber's expert medical evidence did not establish that repeated IV attempts would cause unconstitutional levels of pain. Accordingly, the district court concluded that Barber's claim was more similar to the generic futile-attempts-to-access-veins claim rejected in *Nance*. Consequently, the district court concluded that Barber had not shown a substantial likelihood of success on the merits of his claim and denied the request for a preliminary injunction.

Two days later, Barber filed an amended complaint in the district court, incorporating evidence presented at the evidentiary hearing, and for the first time specifically alleging that he had individualized risk factors that could complicate vein access, including a high body mass index ("BMI") similar to that of inmates James and Smith, and citing the ADOC's past difficulties accessing Barber's veins on multiple occasions.[16]

---

[15] Specifically, Barber testified to one instance in 2004 when he first entered prison in which the ADOC had trouble accessing his veins. ADOC personnel in the infirmary attempted to draw blood and pricked Barber with a needle eight times but were unsuccessful. Barber said the experience was "pretty painful." Barber then stated on cross-examination that, since 2004, he had trouble giving blood "[a] few times," but he did not provide any details about those other instances.

[16] Because the initial complaint was the complaint before the district court when it determined whether Barber's claim had a substantial likelihood of success on the merits for purposes of a preliminary injunction, like the district

Two days after filing the amended complaint and four days after the district court denied the preliminary injunction, Barber filed a notice of appeal and a motion for stay of execution with this Court. We ordered expedited briefing and held oral argument.

With this procedural history in mind, we turn to the merits of Barber's appeal and his request for a stay of execution.

## II.    Standard of Review

We review a district court's decision to deny a preliminary injunction for abuse of discretion. *Scott v. Roberts*, 612 F.3d 1279, 1289 (11th Cir. 2010). "In so doing, we review the findings of fact of the district court for clear error and legal conclusions *de novo*." *Id.* "This scope of review will lead to reversal only if the district court applies an incorrect legal standard, or applies improper procedures, or relies on clearly erroneous factfinding, or if it reaches a conclusion that is clearly unreasonable or incorrect." *Schiavo ex rel. Schindler v. Schiavo*, 403 F.3d 1223, 1226 (11th Cir. 2005); *see also Doran v. Salem Inn, Inc.*, 422 U.S. 922, 931–32 (1975) ("[W]hile the standard to be applied by the district court in deciding whether a plaintiff is entitled to a preliminary injunction is

---

court, we focus on the allegations in the initial complaint, rather than the allegations in the amended complaint that he filed following the evidentiary hearing. *Rosen v. Cascade Int'l, Inc.*, 21 F.3d 1520, 1524 n.5 (11th Cir. 1994) ("Because the consolidated amended complaint was not submitted until after the district court had issued the preliminary injunction at issue in this appeal, however, our inquiry focuses on whether the district court had the authority to issue the preliminary injunction predicated upon the claims raised in the six original complaints . . . .").

stringent, the standard of appellate review simply is whether [the denial of] the injunction in light of the applicable factors constituted an abuse of discretion."); *Siegel v. LePore*, 234 F.3d 1163, 1175 (11th Cir. 2000) (en banc) (explaining that the district court's order denying injunctive relief could be reversed on appeal only "if there was a clear abuse of discretion").

Importantly, the abuse of discretion standard "recognizes the range of possible conclusions the [district court] may reach." *United States v. Frazier*, 387 F.3d 1244, 1259 (11th Cir. 2004) (en banc). It "allows a range of choice for the district court, so long as that choice does not constitute a clear error of judgment." *Id.* (quotations omitted).

Likewise, when it comes to factual findings, under the clearly erroneous standard, "[i]f the district court's view of the evidence is plausible in light of the entire record, an appellate court may not reverse even if it is convinced that it would have weighed the evidence differently in the first instance." *Brnovich v. Democratic Nat'l Comm.*, 141 S. Ct. 2321, 2349 (2021). "Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *Id.* (quotations omitted). In other words, under this standard, we may not reverse "simply because we are convinced that we would have decided the case differently." *Price v. Comm'r, Dep't of Corr.*, 920 F.3d 1317, 1323 (11th Cir. 2019); *see also Cooper v. Harris*, 581 U.S. 285, 293 (2017) ("A finding that is 'plausible' in light of the full record—even if another is equally or more so—must govern.").

## III.   Discussion

Even when life or death interests are at stake, a preliminary injunction or a stay of execution is an extraordinary remedy "not available as a matter of right." *Hill v. McDonough*, 547 U.S. 573, 584 (2006). Indeed, the issuance of a preliminary injunction is "the exception rather than the rule." *United States v. Lambert*, 695 F.2d 536, 539 (11th Cir. 1983). And "[l]ast-minute stays should be the extreme exception." *Bucklew v. Precythe*, 139 S. Ct. 1112, 1134 (2019). A movant is eligible for a preliminary injunction or a stay of execution only if he establishes that (1) he has a substantial likelihood of success on the merits, (2) he will suffer irreparable injury unless the injunction or stay issues, (3) the injunction or stay would not substantially harm the other litigant, and (4) if issued, the injunction or stay would not be adverse to the public interest. *Chavez v. Fla. SP Warden*, 742 F.3d 1267, 1271, 1273 (11th Cir. 2014). The first factor is considered one of "the most critical." *See Nken v. Holder*, 556 U.S. 418, 434 (2009). Where a court concludes that the movant fails to establish a substantial likelihood of success on the merits, "it is unnecessary" for the court to determine whether the movant "satisfied the second, third, or fourth factors." *Grayson v. Warden, Comm'r, Ala.*, 869 F.3d 1204, 1238 n.89 (11th Cir. 2017). Additionally, "a court considering a stay must also apply a strong equitable presumption against the grant of a stay where a claim could have been brought at such a time as to allow consideration of the merits without requiring entry of a stay." *Hill*, 547 U.S. at 584 (quotations omitted); *see also Bucklew*, 139 S. Ct. at 1134 (explaining that dilatory tactics and claims that "could have been

23-12242                Opinion of the Court                    18

brought earlier . . . may be grounds for denial of a stay" (quotations omitted)).  Like the district court, we agree that this case rises and falls on the first factor—whether Barber can show a substantial likelihood of success on the merits of his Eighth Amendment claim.

"The Eighth Amendment, made applicable to the States through the Fourteenth Amendment, prohibits the infliction of 'cruel and unusual punishments.'"  *Glossip v. Gross*, 576 U.S. 863, 876 (2015).    Capital punishment, however, including capital punishment by lethal injection, is constitutional.  *See Baze v. Rees*, 553 U.S. 35, 47, 62 (2008) (plurality opinion).[17]  As the Supreme Court has explained "[s]ome risk of pain is inherent in any method of execution," and the Eighth Amendment "does not demand the avoidance of all risk of pain in carrying out executions," particularly where the pain results "by accident or as an inescapable consequence of death."  *Id.* at 47, 50.  Likewise, the Eighth Amendment does not prohibit procedures that create an "unnecessary risk" of pain without more.  *Id.* at 51.  In other words, as the Supreme Court has emphasized, "the Eighth Amendment does not guarantee a prisoner a painless death—something that, of course, [is not] guaranteed to many people, including most victims of capital crimes."  *Bucklew*, 139 S. Ct. at 1124.  Instead, what the Eighth Amendment forbids are those "forms of punishment that intensif[y] the sentence of death with a (cruel) superaddition of terror, pain, or disgrace."  *Id.* (alteration adopted) (quotations

---

[17] We have recognized that Chief Justice Roberts's plurality opinion "contains the holdings of the Court in [*Baze*]."  *Chavez*, 742 F.3d at 1271 n.4.

omitted). Consequently, "[p]risoners cannot succeed on a method-of-execution claim unless they can establish that the challenged method presents a risk that is '*sure or very likely* to cause serious illness and needless suffering, and gives rise to sufficiently *imminent* dangers.'" *Price*, 920 F.3d at 1325 (emphasis in original) (quoting *Glossip*, 576 U.S. at 877).

Thus, to prevail on his Eighth Amendment challenge, Barber has to establish two things: (1) that the method of execution in question creates "a substantial risk of serious harm, an objectively intolerable risk of harm that prevents prison officials from pleading that they were subjectively blameless for purposes of the Eighth Amendment," and (2) that there is "an alternative that is feasible, readily implemented, and in fact significantly reduce[s] a substantial risk of severe pain." *Id.* at 1326 (quotations omitted). To be clear, Barber's claim "faces an exceedingly high bar" because the Supreme Court "'has yet to hold that a State's method of execution qualifies as cruel and unusual.'" *Barr v. Lee*, 140 S. Ct. 2590, 2591 (2020) (quoting *Bucklew*, 139 S. Ct. at 1124).

Here, the State does not contest that Barber identified a feasible alternative method of execution—nitrogen hypoxia.[18]

---

[18] Given that the State does not contest the district court's conclusion that Barber "successfully identified" nitrogen hypoxia as a feasible alternative method of execution, it is unnecessary for us to address Barber's points on appeal that quarrel with the district court's earlier characterization of his request for this alternative method as "problematic" because Alabama has not finalized a nitrogen hypoxia protocol and is not yet ready to proceed with executions by this method. However, Alabama's lack of a nitrogen hypoxia

23-12242                Opinion of the Court                20

Accordingly, we focus our analysis on whether the district court clearly erred in determining that Barber did not show that he faces a "substantial risk of serious harm" if executed by lethal injection.

Barber argues that the district court erred in finding that he did not show a "substantial risk of serious harm" in light of his evidence that Alabama "failed to carry out a lethal injection in a constitutional manner not once, not twice, but three times in a row" due to "protracted efforts to establish IV access." He maintains that Alabama's "repeated failures demonstrate a pattern of superadding pain to the execution." Further, he alleges that it is highly likely that he will experience the same "needless suffering" because under Alabama's newly amended rules, the State has a longer execution window—giving them more time to attempt IV access—and he presented evidence that he suffers from individual risk factors—namely, that he has a high BMI and that on prior occasions ADOC has had trouble accessing his veins for

protocol notwithstanding, Barber arguably faces another problem with his request for nitrogen hypoxia as an alternative method of execution. Barber failed to show a substantial likelihood that execution by nitrogen hypoxia would significantly reduce a substantial risk of pain when compared to execution by lethal injection. And establishing that the alternative method will "significantly reduce a substantial risk of severe pain" is a key element to a method-of-execution challenge. *See Bucklew*, 139 S. Ct. at 1130. "[A] minor reduction in risk is not enough; the difference must be clear and considerable." *Price*, 920 F.3d at 1329 (quotations omitted). But Barber presented no information related to execution by nitrogen hypoxia or pain risks associated with that method. Nevertheless, because the district court did not address this issue, we do not reach it.

procedures. But Barber's arguments suffer from a fatal flaw—they are premised on the assumption that protracted efforts to obtain IV access (*i.e.*, "repeatedly pricking him with a needle") would give rise to an unconstitutional level of pain. And we expressly concluded that such efforts would not rise to that level in *Nance*. Specifically, the condemned Georgia inmate in *Nance* argued that, due to a medical condition, he had "weak veins" that the execution team would likely have trouble accessing, and that "the state technicians would subject him to an unconstitutional level of pain by repeatedly pricking him with a needle." 59 F.4th at 1157. We explained that the district court correctly rejected the argument that "a futile attempt to locate a vein would give rise to a constitutionally intolerable level of pain," noting that "'the Eighth Amendment does not guarantee a prisoner a painless death.'" *Id.* (quoting *Bucklew*, 139 S. Ct. at 1124).

Barber argues that *Nance* does not control and that we should instead follow our unpublished decision in *Smith*, which also involved a § 1983 Eighth Amendment challenge to Alabama's lethal injection protocol based on protracted IV access issues. Like Barber, Smith filed a § 1983 action, alleging in relevant part that ADOC had "substantially deviated from its Execution Protocol to the point that it would subject Smith to intolerable pain and torture in violation of the Eighth Amendment." 2022 WL 17069492, at *1. The district court concluded that the claim was time-barred and granted the State's motion to dismiss. *Id.* Smith sought to amend his complaint to focus his Eighth Amendment claim on the repeated, protracted efforts to obtain IV access in the James and

23-12242                Opinion of the Court                    22

Miller execution proceedings, which the district court denied, finding that amendment would be futile. *Id.* at *2. Exercising *de novo* review on appeal, we concluded that "[b]ecause of the difficulty in accessing Smith's veins, Smith plausibly pleaded that, considering ADOC's inability to establish difficult IVs swiftly and successfully in the past, [Smith would] face superadded pain as the execution team attempts to gain IV access," and remanded the case for further proceedings.[19] *Id.* at *5–6.

Thus, Barber argues that *Smith* conclusively establishes that he faces a "substantial risk of serious harm" and superadded pain due to repeated IV access attempts, particularly in light of Alabama's recent track record in execution proceedings. Barber's argument is unavailing. *Smith* is an unpublished case and "[o]ur

---

[19] We also note that, following our decision in *Smith*, we granted Smith a stay of execution so that he could further pursue his Eighth Amendment claim in the district court. *Smith v. Comm'r, Ala. Dep't of Corr.*, No. 22-13846, 2022 WL 19831029 (11th Cir. Nov. 17, 2022). The State appealed, and the Supreme Court vacated the stay. *Hamm v. Smith*, 143 S. Ct. 440 (11th Cir. 2022). Although we do not know why the stay in *Smith* was vacated, we do know that a motion for a stay of execution involves a balancing of equities. *See Brooks*, 810 F.3d at 816, 824. By vacating the stay, the Supreme Court implicitly told us that the balance of equities in *Smith* weighed in favor of the State's and the victim's "strong interest in enforcing the criminal judgment without undue interference from the federal courts." *Brooks*, 810 F.3d at 824; *see also Hill*, 547 U.S. at 584 ("Both the State and the victims of crime have an important interest in the timely enforcement of a sentence."). And Smith's case was stronger than Barber's because Smith—unlike Barber—alleged that it would be difficult to access his veins due to "both general and specific risks." *Smith*, No. 22-13781, 2022 WL 17069492, at *4.

unpublished opinions are not precedential"; "they do not bind us or district courts to any degree." *Patterson v. Ga. Pacific, LLC*, 38 F.4th 1336, 1346 (11th Cir. 2022). To the extent that *Smith* may have constituted persuasive authority on the issue of whether repeated IV access attempts can constitute superadded pain and presents a "substantial risk of harm" for purposes of an Eighth Amendment claim, we squarely rejected that argument in *Nance*— a published case which binds us here. *United States v. Steele*, 147 F.3d 1316, 1317–18 (11th Cir. 1998) ("Under our prior precedent rule, a panel cannot overrule a prior one's holding even [if] convinced it is wrong."). Under *Nance*, Barber cannot show that his method of execution creates a "substantial risk of serious harm" and without that, he does not have a substantial likelihood of success on the merits of his Eighth Amendment challenge.[20]

---

[20] Barber takes issue with the fact that *Nance* involved a Georgia inmate and the Georgia Department of Corrections did not have a history of difficulties with IV access, unlike the ADOC. Thus, he argues that his case is different from *Nance*. Likewise, the dissent accuses us of misreading *Nance* because "there was no allegation in *Nance* that Georgia had a track record of past executions in which it subjected death-row prisoners to lengthy periods of multiple painful attempts to establish IV lines in the execution chamber"— and, according to the dissent, that distinction is key and makes Barber's case distinguishable. Our conclusion in *Nance*, however, was based on whether futile attempts to obtain IV access would cause an unconstitutional level of pain, and we concluded such attempts would not give rise to an Eighth Amendment claim, noting that "'the Eighth Amendment does not guarantee a prisoner a painless death.'" 59 F.4th at 1157 (quoting *Bucklew*, 139 S. Ct. at 1124). The cause of the futility—whether it be a medical condition or a pattern of difficulty by the IV Team in securing vein access—does not matter. What matters is that *Nance* held that repeatedly and futilely pricking an inmate

23-12242               Opinion of the Court                    24

Accordingly, contrary to Barber's argument, the district court did not err in relying on *Nance*. Nor did it misapply *Nance*.

*Nance* notwithstanding, even if repeated, protracted attempts at IV access on a condemned inmate could create a substantial risk of serious harm, *Smith* does not establish that the district court abused its discretion in denying Barber's request for a preliminary injunction.[21] As the district court explained, Smith identified specific medical conditions and risk factors unique to him that made IV access difficult. Barber, on the other hand, did not. Nowhere in his initial complaint did Barber include allegations

---

with a needle does not rise to an unconstitutional level of pain—*i.e.*, it is not an Eighth Amendment violation. *Id.*

   Additionally, Barber notes that *Nance* "was decided just months after *Smith* and did not purport to overrule *Smith* or call its holding into question. In fact, *Nance* did not even mention *Smith*." Barber is correct. *Nance* did not address *Smith*, but it did not have to do so. As noted previously, *Smith* is an unpublished case with no precedential value that is not binding on subsequent panels. Rather, an unpublished opinion is relevant only to the extent of its persuasive value, and the *Nance* court did not find *Smith* persuasive. Thus, the fact that *Nance* did not tackle any tension with *Smith* is inconsequential.

[21] We also note that *Smith*'s claims came to us in a different procedural posture and were subject to the lesser *de novo* review standard. In contrast, Barber's claims, are subject to the very deferential abuse of discretion standard. "Our review under this standard is very narrow and deferential." *Gonzalez v. Gov. of Ga.*, 978 F.3d 1266, 1270 (11th Cir. 2020) (quotations omitted). And "[w]e may reverse the district court's order only if there was a *clear* abuse of discretion." *Siegel*, 234 F.3d at 1175 (en banc).

23-12242                Opinion of the Court                25

about his BMI causing issues with vein access[22] or that the ADOC had past difficulties accessing his veins. Although at the evidentiary hearing, Barber's counsel asserted that Barber had a BMI "identical" to Smith and higher than James, Barber provided no details during his testimony concerning his BMI, and he presented no other evidence to establish that a particular BMI presents an elevated risk of complications with IV access to veins or that James's and Smith's BMIs gave rise to the difficulties in accessing their veins. Barber also testified at the evidentiary hearing that, on "a few" occasions[23] in the last two decades, the ADOC had issues accessing his veins and had to prick him multiple times. However, he also testified that on other occasions the ADOC had no issues

_____

[22] Barber acknowledged during the evidentiary hearing that the issue of BMI was "not in the complaint itself," and that he had raised the issue for the first time in his reply brief in support of the motion for preliminary injunction.

[23] We note that Barber testified that the ADOC first had trouble accessing his veins in 2004. Therefore, Barber arguably knew about his specific vein access issue 19 years ago, which would present a time-bar issue because he arguably could have brought his method-of-execution challenge before now. Furthermore, Barber acknowledged in his complaint that ADOC attempted and failed to execute another inmate, Doyle Lee Hamm, in 2018 due to the same IV access issues of which Barber complains. Thus, Barber's Eighth Amendment claim related to ADOC's potentially protracted efforts to establish IV access in condemned inmates accrued back in 2018 and is arguably barred by the two-year statute of limitations. *See McNair v. Allen*, 515 F.3d 1168, 1174 (11th Cir. 2008) (explaining that "a federal claim accrues when the prospective plaintiff knows or has reason to know of the injury which is the basis of the action" (quotations omitted)). Nevertheless, for purposes of this appeal, we accept the district court's determination that Barber's challenge to the manner in which ADOC carries out its lethal injection protocol is timely.

accessing his veins.    Based on the testimony and evidence presented, the district court determined that the evidence was insufficient to establish that Barber faced individualized risks that would complicate IV access to his veins, and that Barber's situation is therefore distinguishable from that in *Smith*.

Additionally, the evidence below established that since the allegedly "botched" executions, ADOC conducted a full review of its execution processes and procedures, determined that no deficiencies existed with the protocol itself,[24] and instituted certain

---

[24] Although Barber and the dissent take issue with the ADOC's determination that there were no deficiencies with Alabama's protocol and procedures and argue that the finding is not reasonable in light of the previous botched executions, nothing in the record supports the conclusion that the ADOC's finding was unreasonable.  Rather, Barber and the dissent point to the fact that the ADOC has not disclosed any information about the investigation and the related findings; therefore, they argue, it follows that ADOC's "no deficiencies" finding is unreasonable.  The logic underlying this premise is flawed.  Neither Barber nor the dissent cite to any authority for the proposition that Barber is entitled to any information concerning the ADOC's internal investigation, much less that such a disclosure is constitutionally compelled. *Cf. Bucklew*, 139 S. Ct. at 1125 (noting that "the Constitution affords a measure of deference to a State's choice of execution procedures and does not authorize courts to serve as boards of inquiry charged with determining best practices for executions" (quotations omitted)).  Indeed, Barber's counsel conceded at oral argument that she was unaware of any such authority.  Regardless, the dissent maintains that "[i]t is difficult to see how personnel changes would cut off the pattern [of difficulty obtaining IV access] given the defendants' insistence that their review found "[n]o deficiencies," in personnel or otherwise."  Thus, the dissent concludes that "[i]n the absence of any evidence about what caused the [prior] failures, there is simply no basis for concluding that any given changes will alleviate the failures."  We disagree.  Despite ADOC's "no deficiencies" finding, ADOC made changes to ensure that it

changes to help ensure successful constitutional executions. These changes included amending Alabama's procedural rules to allow for an extended time frame for the execution to help avoid time pressure issues,[25] expanding the pool of medical personnel eligible

could carry out successful executions, including implementing new certification requirements, expanding the pool of eligible medical personnel, and hiring a new IV Team. Thus, the no deficiencies finding is of no consequence. And, even without knowing the cause of the previous IV access failures, it was entirely reasonable for the district court to infer that these changes will have an effect and alleviate the IV access related issues—after all the changes were focused on the IV Team, and the IV Team is the one responsible for setting the IV lines in the inmate.

Additionally, Barber notes that "failed protocol and practices that the IV Team will presumably follow during the execution do not include the 'important safeguards' that the Supreme Court identified in *Baze*," which included, among other things, a requirement that members of the IV Team have a certain number of years of experience and practice sessions and a time limit on how long the team can take to attempt to establish an IV line. But the Supreme Court did not hold in *Baze*—nor in any case that followed—that such safeguards are constitutionally required.

[25] Barber and the dissent allege that this expanded time frame simply "affords the IV team *six additional hours* to attempt to establish an IV line, making it more, not less, likely that [he] would suffer additional pain. . . ." But there is much more to the required execution protocol than just setting an IV line. For instance, the equipment and supplies to be used in the lethal injection procedure must be inspected and the lethal injection solution must be prepared; an inventory of the condemned inmate's property must be conducted; the condemned inmate is permitted to make a will and have visitors; "the Warden and/or Commissioner will meet with the victims of the condemned inmate's crime"; a physical examination of the condemned inmate must occur prior to the execution; and the inmate must be escorted to the execution location, secured to the gurney, and a heart monitor applied. *See* Redacted Execution Procedures (March 2023) at 6, 9–10 (attached as

to serve on the IV Team, requiring that all members of the IV Team be currently certified or licensed in the United States, and hiring a new IV Team that was not involved with any of the three preceding executions to conduct Barber's execution.[26]

---

Exhibit B to complaint). All of that takes time and must happen even before the IV Team attempts to secure vein access. *Id.* at 10. And those events must necessarily be performed in conjunction with any time delays that occur as a result of pending litigation by the condemned inmate (which we know more often than not is a factor at play). Thus, contrary to Barber's and the dissent's assertion, the expanded time frame for the execution merely means that ADOC has more time to complete all of the steps and acts in the protocol which are necessary to carrying out a successful constitutional execution.

[26] During the evidentiary hearing, Barber's expert nurse reviewed redacted certifications and licensures for the new IV Team and testified that just because a person is certified or licensed as a paramedic, EMT personnel, or a nurse, does not mean that they know how to start IV lines properly, and that licensure or certification "does not equal competency." In response, the State, for the first time, proffered a sworn affidavit from Warden Terry Raybon. Warden Raybon averred in the affidavit that (1) he "participated in the interviews with candidates for the expanded pool of medical personnel"; (2) the "candidates were asked about their relevant experience, licenses, and certifications"; and (3) "[t]he candidates selected all had extensive and current experience setting IV lines." Barber objected to the admission of this affidavit, arguing that he had requested similar information in his discovery requests and the State had objected on privilege grounds. The State explained that it did not produce the information or the affidavit because at the time it provided its responses, it did not have the affidavit. Further, it only became necessary for the State to introduce the affidavit belatedly at the evidentiary hearing to counter Barber's witness's speculative testimony that the members of the IV Team may have no training or experience setting IV lines. The district court admitted the affidavit, finding that any prejudice Barber would suffer from receiving the affidavit a few days after the State's responses to Barber's discovery requests did not "counsel against admission of the information that's

Accordingly, based on the evidence presented, the district court did not clearly err in finding that the intervening changes made by the ADOC "have disrupted the pattern discussed in *Smith*," rendering Barber's claim that the same pattern would continue to occur purely speculative.[27]

Accordingly, based on the evidence presented, the district court did not abuse its discretion in determining that Barber did not have a substantial likelihood of success on the merits of his Eighth

---

probative in this case." Barber challenges on appeal the district court's decision to credit Warden Raybon's belated self-serving affidavit, but we need not concern ourselves with the district court's admission of the affidavit. As detailed in this opinion, even without the affidavit, the district court did not abuse its discretion in denying the motion for a preliminary injunction.

[27] The dissent takes issue with this conclusion but fails to explain how the district court's findings were clearly erroneous based on the record before it or how the district court's decision constitutes a clear abuse of discretion. *Brnovich*, 141 S. Ct. at 2349 ("If the district court's view of the evidence is plausible in light of the entire record, an appellate court may not reverse even if it is convinced that it would have weighed the evidence differently in the first instance."); *Price*, 920 F.3d at 1323 (explaining that we may not reverse "simply because we are convinced that we would have decided the case differently"). And those are the standards we are judicially tasked with applying in this case.

23-12242                Opinion of the Court                30

Amendment claim and in denying the motion for a preliminary injunction.[28]  Consequently, we affirm the district court.[29]

———————————

[28] We also note that Barber waited until May 25, 2023, to file the underlying complaint, even though nothing prevented him from doing so prior to that date.  Barber was aware that the State was prepared to execute him because the State had a pending motion in November 2022 to set his execution date at the time Governor Ivey requested ADOC review its execution process.  Barber could have brought his challenge then, but he did not.  The State then filed a renewed motion to set his execution date on February 24, 2023.  Barber could have brought his challenge then, but he did not.  Although the district court did not reach the issue of whether Barber's delay in bringing his challenge was the type of last-minute application that the Supreme Court strongly disfavors, we note that this delay also weighs in favor of denying Barber's request for a stay.  *See Bucklew*, 139 S. Ct. at 1134 ("Courts should police carefully against attempts to use such challenges as tools to interpose unjustified delay.  Last-minute stays should be the extreme exception, not the norm, and the last-minute nature of an application that could have been brought earlier, or an applicant's attempt at manipulation, may be grounds for denial of a stay." (quotations omitted)); *Woods v. Comm'r, Ala. Dep't of Corr.*, 951 F.3d 1288, 1293 (11th Cir. 2020) ("The Supreme Court has unanimously instructed the lower federal courts on multiple occasions that we must apply a strong equitable presumption against the grant of a stay where a claim could have been brought at such time as to allow consideration of the merits without requiring entry of a stay." (quotations omitted)).

[29] Because Barber cannot satisfy the first preliminary injunction factor, we need not consider the other factors.  *Grayson*, 869 F.3d at 1238 n.89. Nevertheless, those factors also weigh in the State's favor.  *See Ray v. Comm'r, Ala. Dep't of Corr.*, 915 F.3d 689, 701 (11th Cir. 2019) (explaining that "[t]he remainder of the factors we apply when considering a stay amount to a weighing of the equitable interests of the petitioner, the government, and the public").  Because Barber cannot show that he faces a substantial risk of serious harm if he is executed by lethal injection, he cannot show that he faces an irreparable injury if the stay is not granted.  And, if a stay is issued, it would

23-12242                Opinion of the Court                          31

**AFFIRMED.**

---

substantially impair the State's strong interest in seeing Barber's lawfully imposed sentence carried out in a timely manner, and it would be adverse to the public's interest in seeing the sentence carried out as well. *See id.* ("[A]s the Supreme Court has recognized, the [S]tate, the victim, and the victim's family also have an important interest in the timely enforcement of [the inmate's] sentence."). Thus, the district court did not clearly abuse its discretion in denying Barber's request for a preliminary injunction. Finally, because the test for a preliminary injunction and a motion for stay of execution mirror one another, we **DENY** Barber's motion for a stay of execution from this Court.

23-12242                JILL PRYOR, J., Dissenting                1

JILL PRYOR, Circuit Judge, Dissenting:

Eight months ago, the State of Alabama botched the execution of Kenneth Eugene Smith. As the State would tell it, history showed this was an aberration—a regrettable, but isolated, event. Regrettably, the State is wrong. Mr. Smith's horrifying experience was not a singular event; it was just the latest incident in an uninterrupted pattern of executions by Alabama's Department of Corrections ("ADOC") that involved protracted, severely painful, and grisly efforts to establish the intravenous lines necessary to carry the lethal injection drugs into his body. Mr. Smith asked a panel of this Court—including myself—to stay his execution because he feared he would be subjected to superadded pain and terror as the State carried out his death sentence. The State called his claim speculative and asked us to trust that ADOC was prepared to perform the execution without incident. We now know that Mr. Smith was right. Alabama's last three consecutive executions, including his, went so badly that Governor Kay Ivey halted all executions and ordered ADOC to investigate the cause of the failures. After a three-month "review" of its procedures—conducted entirely internally, entirely outside the scope of any court's or the public's scrutiny, and without saying what went wrong or what it fixed as a result—ADOC swears it is ready to try again, with Mr. Barber as its guinea pig.

The district court gave ADOC the green light because Mr. Barber cannot know that the pattern will continue with him. After all, the State made some personnel changes after the review—

though it was careful to deny that its previous personnel caused or contributed to the prior failures. Today the panel majority waves away Mr. Barber's request that we stay his execution, denying him a yellow light to press his serious constitutional claim that the State will violate his Eighth Amendment rights. I dissent. In my view, Mr. Barber is entitled to a stay of execution. The district abused its discretion in denying him a preliminary injunction by finding that the unbroken pattern of botched executions has been interrupted, without evidence to support that inference. I believe that Mr. Barber is likely to succeed in his appeal and should be permitted to return to the district court for some discovery—which he has thus far largely been denied—into what has been causing ADOC to systematically botch executions, whether the changes ADOC has made actually address the cause of the problems, and what changes could be made to avoid an imminent violation of his Eighth Amendment right to be executed free of cruel and unusual treatment.

## I.    BACKGROUND

A jury convicted Mr. Barber of capital murder based on the brutal robbery and murder of Dorothy Epps in 2001. The jury recommended by a vote of 11 to 1 a sentence of death, and the trial judge adopted the jury's recommendation. The Alabama Court of Criminal Appeals affirmed Mr. Barber's conviction and sentence. Both the Alabama Supreme Court and the United States Supreme Court denied certiorari.

In 2019, a district court denied Mr. Barber's federal habeas corpus petition. This Court affirmed the district court's denial. The Supreme Court denied certiorari.

In this case, Mr. Barber challenges not his conviction and death sentence, but the lethal-injection method Alabama will use to execute him. He claims that Alabama's method of execution violates his Eighth Amendment rights. His claim is based on a recent pattern in which ADOC officials have struggled for prolonged periods of time to establish intravenous (IV) lines when attempting to execute death-row prisoners via lethal injection.

Alabama executed Joe Nathan James, Jr. on July 28, 2022. The execution lasted more than three hours, as ADOC's IV team struggled to establish IV lines with which to administer the lethal-injection drugs. By the time ADOC opened the curtain between the execution chamber and the observation room for Mr. James to say his final words, he appeared to be unconscious because he "did not open his eyes or move and did not respond when asked if he had any last words," even though he allegedly had planned on making a final statement. Doc. 50-13 at 19.[1] Because Mr. James's execution was completed, and the process of setting his IV lines took place behind the curtain hiding the proceedings from the view of witnesses, no one apart from the ADOC personnel in the chamber knows for certain what happened during the execution. But a State autopsy of Mr. James's body confirmed that he was

---

[1] "Doc." numbers refer to the district court's docket entries.

23-12242          JILL PRYOR, J., Dissenting          4

punctured multiple times, including in his elbow joints, right foot, forearm, both wrists and both hands during that three-hour period.[2] Following the execution, Commissioner Hamm told reporters that "nothing out of the ordinary" happened, but ADOC later acknowledged that it struggled to establish IV lines in Mr. James's body.[3]

Despite ADOC's acknowledgement that Mr. James's execution was significantly delayed due to its inability to set the IV lines, the defendants forged ahead with lethal injections. Just eight days later, Attorney General Marshall moved the Alabama Supreme Court to set Mr. Barber's execution date. Mr. Barber immediately opposed the motion, arguing that "[t]he uncertainties" around Mr. James's execution "demand[ed] that—before any additional executions are scheduled—the [S]tate conduct a thorough and complete investigation to determine what happened, or implement prophylactic measures to ensure it does not happen again." Doc. 1-11 at 2. No investigation occurred.

---

[2] The State actually had two forensic pathologists perform autopsies on Mr. James's body. The first pathologist found evidence of multiple punctures. The second pathologist was able to positively identify only two needle punctures.

[3] Evan Mealins, *Joe Nathan James' Execution Delayed More than Three Hours by IV Issues, ADOC Says*, Montgomery Advertiser, July 29, 2022, https://www.montgomeryadvertiser.com/story/news/2022/07/29/joe-nathan-james-execution-alabama-delayed-iv-issues/10187322002/ [https://perma.cc/N9ZE-XQ65].

23-12242                JILL PRYOR, J., Dissenting                    5

While Attorney General Marshall's motion to set Mr. Barber's execution date was pending, the State tried—and failed—to execute two more death-row prisoners.

On September 22, 2022, the State attempted to execute Alan Eugene Miller. It failed, and, according to ADOC, "terminated its execution efforts because it had problems accessing" Mr. Miller's veins. *Miller v. Hamm*, No. 22-cv-506-RAH, 2022 WL 16720193, at *1 (M.D. Ala. Nov. 4, 2022). Before ADOC abandoned its attempt to execute Mr. Miller, ADOC personnel "slapp[ed]" his arms "for long periods of time" as the IV team tried to locate a vein and "punctured [his] right elbow pit" in multiple different points trying to find a vein; he could feel the needle as they "turned [it] in various directions" to obtain access. Doc. 50-10 at 2–3; *see* Doc. 51 at 4. Mr. Miller felt his "veins being pushed around inside [his] body by needles, which caused [him] great pain and fear." Doc. 50-10 at 3. After several attempts with needles "going deeper into [his] body than ever before, which caused intense physical pain," Mr. Miller told the IV team "that [he] could feel that they were not accessing [his] veins, but rather stabbing around [his] veins." *Id.* The IV team moved on to different parts of his body and "attempted multiple punctures to his right hand, his left elbow, and his right foot." Doc. 51 at 4. As the district court in this case noted, Mr. Miller described how one attempt to access a vein in his foot "caused sudden and severe pain like he had been electrocuted" because they likely hit a nerve, and his entire body shook in the restraints. *Id.* (alterations adopted) (internal quotation marks omitted). This process continued for one-and-half hours until the IV team abandoned the

23-12242            JILL PRYOR, J., Dissenting            6

attempt because the execution had been "postponed." Doc. 50-10 at 5.

This ordeal occurred despite Commissioner Hamm's prior assurance—in a sworn affidavit in Mr. Miller's lawsuit attempting to stop his execution based on what happened to Mr. James—that ADOC was "ready to carry out [Mr. Miller's] sentence by lethal injection." Doc. 50-11. The day after Mr. Miller's botched execution, the district judge in his case held an emergency hearing. At the hearing, ADOC's counsel represented that "there just was not sufficient time to gain vein access in the appropriate manner in this case, and we just ran out of time." Doc. 38-3 at 20. Yet, just 12 days later, Attorney General Marshall moved the Alabama Supreme Court to reset Mr. Miller's execution on an expedited basis. *Miller*, 2022 WL 16720193, at *1.

Next, on November 17, 2022, the State attempted to execute Kenneth Eugene Smith. ADOC strapped Smith to the execution gurney for four hours beginning at 8:00 p.m.—despite Mr. Smith's pending motion before this Court to stay his execution. Beginning at approximately 10:20 p.m.—two hours after they first strapped him to the gurney—the ADOC team spent approximately an hour inserting needles into Mr. Smith's body to establish IV lines, including multiple attempts in each of his elbows, arms, and hands, as well as repeated "stabbing" in his collarbone area.[4] Doc. 50-13 at

---

[4] The State's lethal-injection protocol authorizes two methods to establish IV access: "[t]he standard procedure," or "if the condemned inmate's veins make obtaining venous access difficult or problematic, qualified medical personnel

23-12242                JILL PRYOR, J., Dissenting                7

5. Just before midnight, Commissioner Hamm announced that the execution had been called off because ADOC personnel failed to establish IV access after "several" attempts, including by a "central line." *Id.* at 43.[5] Afterward, in his federal lawsuit, Mr. Smith stated under oath that he experienced "severe physical pain and emotional trauma" during the attempts to access his veins. Doc. 50-14 at 1.

In response to the three executions with documented failures, Governor Ivey ordered ADOC to conduct a "top-to-bottom review" of the lethal-injection execution process. Doc. 51 at 5 (internal quotation marks omitted). She simultaneously asked Attorney General Marshall to withdraw all pending motions to set execution dates, including Mr. Barber's, while ADOC conducted the investigation. Attorney General Marshall withdrew the motions. Commissioner Hamm stated that he "agree[d] with Governor Ivey that" ADOC had to "get [the lethal-injection protocol] right" and that "[e]verything [was] on the table" for review," including "train[ing] and prepar[ation]" and "personnel and equipment." Doc. 1-3 at 2.

---

may perform a central line procedure to obtain venous access." Doc. 1-2 at 18. The district court found that the medical personnel's attempt at a central line procedure on Mr. Smith was "in line with Alabama's execution protocol." Doc. 51 at 5.

[5] *See* Jarvis Robertson, *Another Execution Halted Because of Difficulties with Intravenous Lines,* WVTM, (Nov. 18, 2022), https://www.wvtm13.com/article/stay-of-execution-granted-to-kenneth-smith/41999280 [https://perma.cc/QK6D-WBUX].

23-12242            JILL PRYOR, J., Dissenting            8

A little less than three months later, on February 24, 2023, Commissioner Hamm sent Governor Ivey a one-and-a-half-page letter announcing that ADOC's review was "complete" Doc. 1-5 at 2. The letter stated that ADOC had investigated its own execution process. It reported that the review included "evaluating" its "legal strategy in capital litigation matters, training procedures for [ADOC] staff and medical personnel involved in executions, increasing the number of medical personnel utilized by [ADOC] for executions, assisting medical personnel participating in the process, and the equipment on-hand to support individuals participating in the execution." *Id*. The letter did not reveal anything about the review's methodology or results. Without describing any weaknesses or deficiencies or providing any explanation for the prior failures, the letter represented that ADOC had "decided to add to its pool of available medical personnel for executions" and had "ordered and obtained new equipment . . . for use in future executions."[6] *Id*. at 3. No other changes to the lethal-injection protocol or processes were noted.

On the same day Commissioner Hamm sent his letter to the governor, Attorney General Marshall moved for the second time to set an execution date for Mr. Barber. Mr. Barber immediately requested discovery from the defendants about ADOC's review.

---

[6] According to the defendants' limited discovery responses in this case, the only new equipment obtained was "[a]dditional straps for securing an inmate on the execution gurney." Doc. 38-1 at 8.

23-12242                JILL PRYOR, J., Dissenting                9

The defendants responded that "there will be no substantive response to your request[s]." Doc. 1-19 at 3.

Mr. Barber then filed a response in the Alabama Supreme Court opposing their motion to set his execution. He argued that ADOC's perfunctory investigation into its own execution process was too brief to meaningfully assess the deficiencies; that ADOC failed to disclose any results from the investigation beyond Commissioner Hamm's conclusory letter; and that ADOC made no meaningful changes to prevent, in Mr. Barber's execution, the prolonged, painful efforts to establish IV access experienced by Mr. James, Mr. Miller, and Mr. Smith. Concurrently, he filed a motion to stay his execution, a motion to compel the defendants to respond to his discovery requests, and a motion to preserve evidence of his own execution.

The Alabama Supreme Court denied without opinion or oral argument all of Mr. Barber's motions and granted Attorney General Marshall's motion for an execution warrant. The May 3 order authorized ADOC, under a newly-amended Alabama Rule of Appellate Procedure, to execute Mr. Barber "within a time frame set by the Governor." Doc. 1-7 at 2.[7]

---

[7] Before ADOC's investigation was completed, Governor Ivey sent a letter to the Alabama Supreme Court, urging that court to amend Alabama Rule of Appellate Procedure 8(d)(1) to expand the time in which ADOC could complete an execution. The letter included proposed new language that would allow ADOC more time, specifically if a prisoner's litigation—like Mr. Barber's constitutional challenge, and those filed by Mr. Miller and Mr. Smith in advance of their failed executions last fall—delayed the execution's

23-12242          JILL PRYOR, J., Dissenting          10

Mr. Barber sued the defendants in district court on May 25, 2023, asserting under 42 U.S.C. § 1983 an as-applied Eighth Amendment challenge to Alabama's lethal-injection method of execution. Mr. Barber's Eighth Amendment claim alleged that he would experience prolonged, severe, added pain if the State were permitted to execute him by lethal injection because, among other reasons:

> Despite their repeated failure to establish IV access, Defendants have not instituted any known and meaningful safeguards to date. Nor have they undertaken any effort to ensure that the impending execution of Mr. Barber does not result in another prolonged, severely painful, and ultimately botched attempt. The key problems causing the repeated failures therefore remain in effect, which places Mr. Barber in substantial risk of serious harm.

---

progress. The Court responded by amending the rule. It removed the provision that "[t]he supreme court shall at the appropriate time enter an order fixing a date of execution," Ala. R. App. P. 8(d)(1) (1997), and replaced it with the following language:

> The supreme court shall at the appropriate time enter an order authorizing the Commissioner of the Department of Corrections to carry out the inmate's sentence of death within a time frame set by the governor . . . .

Ala. R. App. P. 8(d)(1) (2023). Thus, the Alabama Supreme Court would no longer set a date of execution when issuing an execution warrant; instead, the amended rule authorized the governor to set a "time frame" for the execution. *Id.*

Doc. 1 at 23.

Five days after Mr. Barber filed his complaint alleging that Alabama's lethal injection would be unconstitutional as applied to him, Governor Ivey set Mr. Barber's execution for the 30-hour period between July 20, 2023 at 12:00 a.m. and July 21, 2023 at 6:00 a.m.—less than two months away.

As soon as Governor Ivey set the execution date, making clear that the State would proceed to carry out Mr. Barber's execution by lethal injection despite his pending legal challenge, Mr. Barber sought a preliminary injunction on June 5. He did not seek to stay his execution but instead sought an order enjoining the State from executing him by lethal injection and requiring it to carry out his execution by nitrogen hypoxia.[8]

Two days after filing his preliminary injunction motion, Mr. Barber served his first set of requests for production and interrogatories in the federal case. The defendants agreed to expedite discovery due to the compressed timeline. Among other things, Mr. Barber posed interrogatories concerning ADOC's review of its execution procedures in Commissioner Hamm's letter and requested documents regarding the same. When the defendants responded on June 23, the bulk of their responses were

---

[8] The district court construed Mr. Barber's motion as a motion that "for all intents and purpose . . . operates as a motion to stay his execution" because "such an order would effectively stay his execution for an indefinite period since the Defendants are not prepared to conduct executions by this method." Doc. 51 at 9.

23-12242            JILL PRYOR, J., Dissenting            12

privilege-based objections.[9] They did, however, include a response stating that the investigation found "[n]o deficiencies." Doc. 45-3 at 2. On June 30, Mr. Barber's attorneys filed a motion to compel responses to their discovery requests. That motion is still pending before the district court.

On July 5, 2023, the district court heard oral argument "on all pending motions," including Mr. Barber's motion for a preliminary injunction, the defendants' motion to dismiss, and Mr. Barber's motion to compel. Doc. 53 at 4. At the hearing, in support of the motion for a preliminary injunction, Mr. Barber presented live testimony from one witness, an experienced registered nurse, and also introduced sworn affidavits from two additional witnesses, as well as dozens of exhibits.

At the hearing, the defendants introduced a single piece of evidence to oppose Mr. Barber's motion: an affidavit by Warden Raybon dated June 29, 2023. This was the first time Mr. Barber learned about the affidavit or its contents, and he moved to strike it. He argued that the defendants had "not previously produced information [] contained in th[e] affidavit that should have been produced before today" in response to their discovery requests. *Id.* at 118. Further, by introducing the surprise affidavit—without any supporting information—he argued, the defendants were "gaining an advantage from selectively disclosing pieces of their

---

[9] Mr. Barber has repeatedly and consistently offered to agree to enter a protective order with the defendants to mitigate security and confidentiality concerns.

23-12242          JILL PRYOR, J., Dissenting          13

investigation." *Id.* at 120. Essentially, they were saying that Barber did not need to worry about the "three consecutively botched executions" because of the investigation while "not providing any discovery whatsoever . . . about what happened in that investigation unless it is a selective waiver to their benefit." *Id.*

Despite describing the defendants' choice to "spring" the affidavit on Mr. Barber "in the middle of a hearing" as "purposeful," the district court admitted the affidavit. *Id.* at 122. In the affidavit, Warden Raybon averred that the personnel who would perform Mr. Barber's execution "did not participate in the preparations for" the executions of Mr. James, Mr. Miller, and Mr. Smith. Doc. 50-27 at 2. Warden Raybon represented that he "participated in the interviews with candidates for the expanded pool of medical personnel" and in the interviews "candidates were asked about their relevant experience, licenses, and certifications." *Id.* at 1–2. He also stated in conclusory fashion that those selected "had extensive and current experience with setting IV lines." *Id.* at 2. There was no additional supporting detail, even though such information was covered by Mr. Barber's discovery requests about the credentials and qualifications of the IV team members. Warden Raybon was not present at the hearing; Mr. Barber's attorneys had no opportunity to cross-examine him.

After the hearing, the district court denied Mr. Barber's motion for a preliminary injunction. The district court found that, following its internal review, ADOC made "meaningful" changes to the execution protocol and procedures including "a longer time

23-12242              JILL PRYOR, J., Dissenting              14

frame for the execution set by the Governor and a new IV team consisting of individuals who did not participate in any prior execution or execution attempt." Doc. 51 at 6, 22. The district court concluded that, as a result, ADOC's "intervening actions have disrupted the pattern" of prolonged execution attempts, and therefore Mr. Barber could not demonstrate a substantial risk of serious harm warranting a preliminary injunction. *Id.* at 16–17. The district court did not address the remaining preliminary-injunction factors.[10]

Mr. Barber filed a notice of appeal challenging the district court's denial of his motion for a preliminary injunction. He moves this Court to stay his execution pending appeal.

## II.     LEGAL STANDARD

We review the district court's denial of a motion for preliminary injunction for abuse of discretion. *See Long v. Sec'y, Dep't of Corr.*, 924 F.3d 1171, 1175 (11th Cir. 2019). "A district court abuses its discretion if, among other things, it applies an incorrect legal standard, follows improper procedures in making the

---

[10] To succeed on a motion for a preliminary injunction, a movant must show: "(1) a substantial likelihood of success on the merits; (2) that the preliminary injunction is necessary to prevent irreparable injury; (3) that the threatened injury outweighs the harm the preliminary injunction would cause the other litigant; and (4) that the preliminary injunction would not be averse to the public interest." *Chavez v. Fla. SP Warden*, 742 F.3d 1267, 1271 (11th Cir. 2014). Having concluded that Mr. Barber failed to satisfy the first requirement, the district court was not required to address the other three factors. *See Schiavo ex rel. Schindler v. Schiavo*, 403 F.3d 1223, 1226 (11th Cir. 2005).

determination, or makes findings of fact that are clearly erroneous." *Id.* (internal quotation marks omitted). "A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Ferguson v. Comm'r, Ala. Dep't of Corr.*, 69 F.4th 1243, 1254 (11th Cir. 2023) (alteration adopted) (internal quotation marks omitted). We have explained that under this standard, "[a]t a minimum, there must be substantial evidence" to support a finding. *United States v. Ellisor*, 522 F.3d 1255, 1273 n.25 (11th Cir. 2008).

In deciding a motion to stay execution, we must determine whether the movant has established that "(1) he has a substantial likelihood of success on the merits; (2) he will suffer irreparable injury unless the injunction issues; (3) the stay would not substantially harm the other litigant; and (4) if issued, the injunction would not be adverse to the public interest." *Price v. Comm'r, Dep't of Corr.*, 920 F.3d 1317, 1323 (11th Cir. 2019) (emphasis omitted) (internal quotation marks omitted). "The first and most important question regarding a stay of execution is whether the petitioner is substantially likely to succeed on the merits of his claim." *Id.* (internal quotation marks omitted).

## III.    DISCUSSION

Mr. Barber argues on appeal that the district court abused its discretion by denying his motion to preliminarily enjoin the defendants from executing him by lethal injection because the court relied on clearly erroneous factual findings to conclude that

he had not demonstrated a substantial likelihood of success on the merits. And in his motion to stay his execution pending appeal, Mr. Barber argues that he is likely to succeed on the merits of his Eighth Amendment claim, that the other stay-of-execution factors also weigh in his favor, and that he has not caused unnecessary delay that weighs against his entitlement to a stay.

Because I agree with Mr. Barber that the district court's findings—that the changes ADOC made after its investigation interrupted the pattern of botched executions on which Mr. Barber's claim relies—were clearly erroneous, I would reverse the district court's order denying the motion for a preliminary injunction. Further, because I agree with Mr. Barber that he has satisfied the stay-of-execution factors and has not caused unnecessary delay, I would grant his motion to stay his execution.

I first address the merits of Mr. Barber's appeal. Next, I consider each of the stay-of-execution factors.

## A. The district court abused its discretion in denying Mr. Barber's motion for preliminary injunction.

In his § 1983 lawsuit, Barber claims that his impending execution by lethal injection is substantially likely to violate the Eighth Amendment's prohibition on cruel and unusual punishment. To succeed on his claim, Mr. Barber must show, first, that the method of execution he challenges poses "a substantial risk of serious harm," meaning "an objectively intolerable risk of harm that prevents prison officials from pleading that they were subjectively blameless for purposes of the Eighth Amendment."

*Baze v. Rees*, 553 U.S. 35, 50 (2008) (internal quotation marks omitted). Second, he must identify "a feasible and readily implemented alternative method of execution that would significantly reduce a substantial risk of severe pain." *Bucklew v. Precythe*, 139 S. Ct. 1112, 1125 (2019). Because Mr. Barber has shown a substantial likelihood that he will succeed on this claim, the district court abused its discretion by denying his motion for a preliminary injunction.

The district court concluded that Mr. Barber had not shown a substantial likelihood of success on the merits of his Eighth Amendment claim because he failed to establish the first element of his Eighth Amendment method-of-execution claim, a substantial risk of serious harm. The district court's denial of Mr. Barber's motion for a preliminary injunction rested on its finding that "ADOC's investigation and the corresponding changes were designed to address the issues seen in the previous three execution attempts and demonstrate an attempt to remedy the emergent pattern recognized in" *Smith v. Commissioner, Alabama Department of Corrections*, No. 22-13781, 2022 WL 17069492 (11th Cir. Nov. 17, 2022) (unpublished). Doc. 51 at 17; *see id.* at 16–17 (finding that "in Barber's case, intervening actions have disrupted the pattern discussed in *Smith*"); *see also id.* at 18 (finding that ADOC's "investigation interrupt[ed] the emergent pattern seen in recent execution attempts"). Thus, the court concluded, Mr. Barber failed to establish the first prong of his Eighth Amendment claim because he "cannot show the investigation and corresponding changes will

23-12242          JILL PRYOR, J., Dissenting          18

not address the prolonged efforts to obtain IV access detailed in *Smith*." *Id*. at 17.

As I explain below, the district court relied on clearly erroneous factual findings that ADOC's "intervening actions have disrupted the pattern discussed in *Smith*" in concluding that Mr. Barber cannot demonstrate a substantial risk of serious harm. Doc. 51 at 16–17.

    1.  *Mr. Barber faces a substantial risk of serious harm.*

A "substantial risk of serious harm" for Eighth Amendment purposes can involve "a lingering death," *Baze*, 553 U.S. at 49 (internal quotation marks omitted), or the "superaddition of terror [or] pain" to the death sentence. *Bucklew*, 139 S. Ct. at 1124 (alteration adopted) (internal quotation marks omitted). Mr. Barber maintains that he faces such a risk because ADOC's three previous attempts to carry out executions by lethal injection have suffered from serious problems that will also plague his own execution: "protracted efforts to establish IV access." Appellant's Br. at 19 (internal quotation marks omitted).

We recognized in *Smith* that a prolonged period of painful, unsuccessful attempts to obtain IV access could amount to cruelly "superadd[ing] pain to the death sentence" in violation of the Eighth Amendment.[11] *Bucklew*, 139 S. Ct. at 1127; *Smith*, 2022 WL

---

[11] Mr. Barber also argues that a prolonged execution attempt including unsuccessful multiple attempts to access his veins will likely cause him to suffer a "lingering death." *Baze*, 53 U.S. at 49 (internal quotation marks

17069492, at *4. In my view, given the pattern that has emerged from Alabama's last three executions of protracted, painful, and in two of the three cases, ultimately unsuccessful attempts to establish IV access, Mr. Barber has shown a substantial likelihood of success on the merits. I would reach this conclusion for the reasons set forth in this Court's recent unpublished opinion in *Smith*. In that case, we held that Mr. Smith stated an Eighth Amendment claim based on the same pattern of lethal-execution failures—a pattern which now includes Mr. Smith's own failed execution attempt since our *Smith* decision issued.

Mr. Smith appealed the district court's dismissal of his § 1983 Eighth Amendment challenge to Alabama's lethal-injection method of execution. *Smith*, 2022 WL 17069492, at *5. In his proposed amended complaint, he alleged that Alabama's "Execution Protocol [did] not expressly prevent the hours-long attempt to establish intravenous access that allegedly resulted in superadded pain during James's execution and Miller's attempted execution." *Id.* at *3. A panel of this Court reversed the district court's denial of Mr. Smith's motion for leave to amend. We explained that the allegations in the proposed amended complaint "show[ed] a pattern of difficulty by ADOC in achieving IV access with prolonged attempts." *Id.* at *4. Based on the pattern of ADOC's failures, and Mr. Smith's allegations that his body mass index, among other things, would make establishing IV access

omitted). Establishing either a substantial risk of superadded pain or a lingering death will suffice; he is not required to establish both.

23-12242               JILL PRYOR, J., Dissenting                    20

difficult, we concluded that he had "plausibly pleaded that, considering ADOC's inability to establish difficult IVs swiftly and successfully in the past, he will face superadded pain as the execution team attempts to gain IV access." *Id.* at *5. I acknowledge that as an unpublished opinion, *Smith* is not binding precedent, and unlike this case, it was at the motion to dismiss stage. But *Smith* is highly persuasive authority on whether prolonged attempts to gain IV access through standard IVs or through a central-line procedure can rise to the level of an Eighth Amendment violation given that Mr. Barber makes essentially the same claim.[12]

---

[12] Following Mr. Smith's failed attempted execution, the defendants in Mr. Smith's § 1983 case moved to dismiss his complaint, arguing that "difficulty establishing IV access and the pain resulting from being poked and prodded with needles [did] not rise to the level of cruel and unusual punishment." *Smith v. Hamm*, No. 2:22-CV-497-RAH, 2023 WL 4353143, at *7 (M.D. Ala. July 5, 2023). District Judge Austin Huffaker denied the motion to dismiss and rejected this argument, observing that Mr. "Smith d[id] not claim that the use of needles to establish venous access is per se cruel and unusual punishment." *Id.* at *7. Instead, the court explained that Mr. Smith was claiming that "multiple needle insertions over the course of one-to-two hours into muscle and into the collarbone in a manner emulating being stabbed in the chest . . . goes 'so far beyond what is needed to carry out a death sentence that it could only be explained as reflecting the infliction of pain for pain's sake.'" *Id.* at *7 (alterations adopted) (quoting *Bucklew*, 139 S. Ct. at 1124). Judge Huffaker concluded that these allegations were sufficient to state a claim for relief. *Id.* Using reasoning similar to Judge Huffaker's, I would conclude, based on Mr. Barber's evidence showing a pattern of multiple executions involving painful protracted efforts to establish IV access, that he has shown a substantial likelihood of success on his claim.

The majority concludes that Mr. Barber cannot carry his burden of showing that he faces a substantial risk of serious harm during his execution because our decision in *Nance v. Commissioner, Georgia Department of Corrections*, 59 F.4th 1149 (11th Cir. 2023), forecloses the claim that a prolonged period of unsuccessful attempts to obtain IV access amounts to cruelly superadding pain to the death sentence. *See* Maj. Op. at 23–24 & n.20 ("What matters is that *Nance* held that repeatedly and futilely pricking an inmate with a needle does not rise to an unconstitutional level of pain . . . it is not an Eighth Amendment violation."). The majority misreads *Nance*.

Michael Nance, a Georgia death-row prisoner, filed a § 1983 action challenging the constitutionality of Georgia's lethal-injection protocol as applied to him. 59 F.4th at 1152. In his complaint, Mr. Nance alleged, among other things, that his veins were compromised and that, as a result, when the Department of Corrections prepared him for execution by lethal injection, he might "blow" a vein "and leak the drug into the surrounding tissue." *Id.* He also alleged that the Department's "repeated[] attempt[s] to insert needles into unidentifiable and/or inaccessible veins" would subject him to an unconstitutional level of pain. *Id.* at 1156 (internal quotation marks omitted). This Court reversed the district court's dismissal of his claim that due to the poor condition of his veins, lethal injection was likely to cause him serious pain. *Id.* But we concluded that the district court properly rejected Nance's claim that he would be subjected to an unconstitutional level of pain if he were "repeatedly prick[ed] with a needle." *Id.* at 1157. We

23-12242          JILL PRYOR, J., Dissenting          22

said, "Nance did not plausibly allege that a futile attempt to locate a vein would give rise to a constitutionally intolerable level of pain." *Id.*

Importantly, there was no allegation in *Nance* that Georgia had a track record of past executions in which it subjected death-row prisoners to lengthy periods of multiple painful attempts to establish IV lines in the execution chamber. *Nance* merely recognized that, without more, a bare allegation that a death-row prisoner would be subjected to a constitutionally intolerable level of pain due to repeated attempts to establish an IV line is not plausible. *See id.* Here, though, we have more. Mr. Barber alleged in his complaint—and later came forward with evidence of—a pattern based on previous executions in which ADOC superadded pain through its prolonged attempts to establish IV access.

Because there was no allegation of such a pattern in *Nance*, there was no holding that controls this case. *See United States v. Aguillard*, 217 F.3d 1319, 1321 (11th Cir. 2000) (explaining that "[t]he holdings of a prior decision can reach only as far as the facts and circumstances presented to the Court in the case which produced that decision" (internal quotation marks omitted)); *see also United States v. Files*, 63 F.4th 920, 929 (11th Cir. 2023) (explaining that "legal conclusions predicated on facts that aren't actually at issue" are dicta); *Edwards v. Prime, Inc.*, 602 F.3d 1276, 1298 (11th Cir. 2010) ("We have pointed out many times that regardless of what a court says in its opinion, the decision can hold nothing beyond the facts of that case.").

Here, the district court's order and the evidence in the record undoubtedly show that there is a pattern of ADOC superadding pain during executions throughout its prolonged attempts to establish IV access. The unrebutted evidence from Mr. Barber's three expert witnesses establishes that IV access should take only a few minutes and never more than an hour, even with a resisting and uncooperative subject. The defendants offered no evidence to refute this testimony. And the essential facts of the execution failures in the cases of Mr. James, Mr. Miller, and Mr. Smith are largely undisputed. In each case, there were prolonged attempts—spanning from one to several hours—to gain IV access that were made in various parts of the prisoners' bodies, resulting in multiple, visible injuries. Mr. Miller testified by affidavit in this case that during the repeated, protracted efforts, he felt his "veins being pushed around inside [his] body by needles, which caused [him] great pain and fear." Doc. 50-10 at 3. One of the many attempts to access a vein in in his foot likely hit a nerve and "caused sudden and severe pain" like he "had been electrocuted," which made his "entire body shake in the restraints." *Id.* at 4. And Mr. Smith described (under oath) that he experienced "severe physical pain and emotional trauma" during the attempts to access his veins. Doc. 50-14 at 1. Those efforts included including repeated needle insertions in his collarbone area to gain access through a central line which he said felt like "stabbing." Doc. 50-13 at 5. As members of the IV team moved on from attempts in his extremities to the collarbone-area insertions, Mr. Smith was "very fearful because he did not know what was happening." *Id.* at 38. These collarbone

23-12242                JILL PRYOR, J., Dissenting                24

"needle jabs . . . caus[ed] him severe pain." *Id.* Given this pattern, any difficulty establishing IV access in Mr. Barber's execution could not be described as an "isolated mishap" that is merely "regrettable." *Baze*, 553 U.S. at 50. Rather, the pattern demonstrates that Alabama's procedure "gives rise to a substantial risk of serious harm" in Mr. Barber's case. *Id.* (internal quotation marks omitted).

The district court found that Mr. Barber failed to demonstrate a substantial risk of serious harm because he could not "show that the investigation and corresponding changes will not address the pattern of prolonged efforts to obtain IV access detailed in *Smith*." Doc. 51 at 17. In the district court's and the defendants' view, ADOC's review of its own execution protocol and procedures and the subsequent changes ADOC made have intervened and disrupted the pattern of prolonged execution efforts.

Mr. Barber's execution is the first that Alabama will attempt since its failed executions of Mr. Miller and Mr. Smith. As the district court explained, after Mr. Smith's execution was called off, Governor Ivey called for a "top-to-bottom' review" of the State's legal injection policies and procedures to determine what had gone wrong and how to fix it. *Id.* at 5 (internal quotation marks omitted). In addition, Commissioner Hamm promised that "[e]verything [was] on the table for review." Doc. 1-3 at 2. And yet the only information the defendants have disclosed about the review is Commissioner Hamm's one-and-a-half-page letter to Governor

23-12242          JILL PRYOR, J., Dissenting          25

Ivey concluding that he was "confident that the Department is as ready as possible" to perform executions. Doc. 1-5 at 3. The defendants' inexplicable position in this case—despite the pattern of execution failures so serious that it caused the governor to call for an investigation and ask the State's Attorney General to halt executions pending the outcome—is that "[n]o deficiencies were found" during the review. Doc. 38-1 at 3.

This denial and conclusory reassurance resemble the defendants' public comments made after the execution of Mr. James and the attempted executions of Mr. Miller and Mr. Smith. After the State spent three hours trying to gain IV access to execute Mr. James, Commissioner Hamm told reporters that "nothing out of the ordinary happened" during the execution. Doc. 50-5 at 2. Of Mr. Miller's attempted execution, an ADOC representative told the district judge in his case that "there just was not sufficient time to gain vein access." Doc. 38-3 at 19. This failure occurred *after* Commissioner Hamm assured the court, in a sworn affidavit, that ADOC was "ready to carry out [Mr. Miller's] sentence by lethal injection on September 22, 2022." Doc. 50-11. And when ADOC tried and failed to set Mr. Smith's IV lines, Commissioner Hamm's press conference again explained that the IV team simply ran out of time.[13]

---

[13] *See* Video of Defendant Hamm's press conference, available online at https://twitter.com/i/broadcasts/1YqJDorPpmwGV.

Given the minimal evidence that ADOC provided about its review beyond its position in this case that "[n]o deficiencies were found," Doc. 38-1 at 3, and ADOC's own refusal to link the changes to any findings in its review, there was no reasonable basis for the district court to find that the investigation and subsequent changes by ADOC severed the causal chain between the lethal-injection procedures and the pattern of botched execution efforts. The first change the district court identified was "a personnel change." Doc. 51 at 6. ADOC represented that "no person who will be responsible for setting IV lines during Mr. Barber's execution participated in any previous execution." *Id.* (alteration adopted) (internal quotation mark omitted). The district court also credited and relied upon Warden Raybon's statements in the affidavit the defendants introduced for the first time at the hearing, that he "participated in the interviews with candidates from an expanded pool of medical personnel eligible to place the IV." *Id.* (internal quotation marks omitted). The second change was that the governor is now permitted "to set an extended time frame to conduct executions." *Id.* at 7. The district court found that this change was significant because "[t]he extended time permits the medical personnel to set the IV without the time pressure caused by legal challenges on the execution date." *Id.* The district court found that together "[t]hese intervening actions cut off" the pattern of executions requiring protracted efforts to establish IV access. *Id.* at 22.

The district court clearly erred because there was no evidence in the record to support its inference that the investigation led to any meaningful change in Alabama's practices

23-12242               JILL PRYOR, J., Dissenting               27

and procedures that would disrupt the pattern of prolonged efforts to obtain IV access. I address in more detail why, for each purported change, the record does not support the district court's causal inference.

### a. Personnel Changes

After finding "[n]o deficiencies" with the execution protocol, Doc. 38-1 at 3, and without saying what weaknesses the changes were designed to address, ADOC maintains that it made some personnel-related changes to the IV team for lethal-injection executions that the district court found made Mr. Barber's allegations that he will suffer the same fate as Mr. James, Mr. Miller, and Mr. Smith "speculative." Doc. 51 at 22. Thus, Mr. Barber has failed to meet his burden to establish a substantial risk of serious harm.[14] The defendants concede that the new IV team "could possibly encounter similar difficulties," Doc. 35 at 12 (emphasis omitted), during Mr. Barber's execution; however, they maintain that this possibility does not present a substantial risk. I disagree.

To prove the changes ADOC made after its review, the defendants introduced only a single piece of evidence: a two-page affidavit—never disclosed to Mr. Barber's counsel—by Warden Raybon containing four paragraphs about the personnel changes. The affidavit stated that the personnel who would be responsible

_____

[14] The district court's order describes "three meaningful changes" made by ADOC. Doc. 51 at 6. The list includes changes in personnel and changes in the selection of personnel as two separate changes. For clarity, we address the district court's findings regarding personnel together.

23-12242          JILL PRYOR, J., Dissenting          28

for setting the IV lines for Mr. Barber's execution "did not participate in the preparations for" the executions of Mr. James, Mr. Miller, or Mr. Smith; that Warden Raybon "participated in the interviews with candidates for the expanded pool of medical personnel"; that in the interviews "candidates were asked about their relevant experience, licenses, and certifications," and that those selected "had extensive and current experience with setting IV lines." Doc. 50-27 at 1–2. The district court admitted the affidavit over Mr. Barber's objections that he previously was unaware of the affidavit and in fact had requested in discovery and moved to compel the defendants to produce the very information it contained. Based on the affidavit, the district court inferred that the new IV team and Warden Raybon's participation in the interviews with candidates cut off the pattern we described in *Smith*. But in the absence of any evidence about the cause of the prior failures, in the affidavit or anywhere in the record, the district court's finding that the change in the IV team interrupted the pattern was clearly erroneous.

As an initial matter, it is difficult to see how personnel changes would cut off the pattern given the defendants' insistence that their review found "[n]o deficiencies," in personnel or otherwise. Doc. 38-1 at 3. In the absence of any evidence about what caused the failures, there is simply no basis for concluding that any given changes will alleviate the failures. Here, for example, there is no evidence in the record from which this Court or the district court could glean whether the "expanded pool of medical personnel" have the same or similar credentials as the former IV

23-12242          JILL PRYOR, J., Dissenting          29

team members who participated in the previous execution attempts.[15] Hiring a new IV team does not ensure a more effective team without knowing facts about the old team for comparison. And Warden Raybon's representation that the expanded pool of personnel all had "extensive . . . experience in setting IV lines" proves nothing unless we know how their experience compares to that of the former team, or even whether a lack of experience contributed to the prior problems. And no evidence reveals whether the ADOC Commissioner previously participated in interviews for the IV team pool. And as far as I can tell from the record, Commissioner Hamm is not a medical professional or expert; there is no evidence to suggest that his participation in personnel interviews was likely to have any meaningful impact.

Ultimately, the Raybon affidavit raises more questions than it purports to answer. And it is worth mentioning that we lack answers to these questions because the defendants refused to produce documents or information regarding the investigation, the selection process for the new IV team, or details about the group's qualifications compared with former team members. Neither Mr. Barber nor any court has had the chance to test Warden Raybon's

---

[15] The defendants produced in discovery redacted copies of licenses and certifications as emergency medical technicians (EMTs), paramedics, and one registered nurse. This documentation said nothing about their experience in setting IV lines, and Mr. Barber's unrebutted expert testimony established that although nurses and EMTs might be qualified to set IV lines, whether they were qualified would depend on their individual training and experience, none of which is revealed in the documents the defendants produced.

assertions. The affidavit offered selective, conclusory statements in a summary and self-serving fashion while the defendants were unwilling to provide any supporting information other than redacted copies of licenses and certifications. Without more, the statements in the Raybon affidavit simply do not support the district court's inference that the personnel changes the defendants made were likely to break the pattern of execution failures at the heart of Mr. Barber's method-of-execution claim.

### b. *Expanded time frame*

The district court also relied upon the expanded time in which the State may complete the execution (from 6:00 p.m.–12:00 a.m. to 6:00 p.m.–6:00 a.m.) as a factor that cuts off the pattern on which Mr. Barber's claim relies. I fail to see how that change reduces the likelihood that Mr. Barber will suffer a prolonged period of painful attempts to obtain IV access. To the contrary, I agree with Mr. Barber that it increases it increases the risk that he will suffer a constitutional violation. The district court's inference was unsupported by the record and thus an abuse of discretion.

Under Alabama's newly-amended Rule of Appellate Procedure 8(d)(1), the Alabama Supreme Court no longer sets the date or time frame for an execution. Instead, the Court authorizes the governor to set a time frame. Ala. R. App. P. 8(d)(1). Governor

23-12242              JILL PRYOR, J., Dissenting                31

Ivey set the time frame for Mr. Barber's execution as July 20, 2023, at 12:00 a.m. through July 21, 2023, at 6:00 a.m.[16]

Mr. Miller and Mr. Smith each recounted their own experiences during which ADOC personnel spent one hour and one-and-a-half hours, respectively, attempting to establish IV lines. They testified by affidavit that they experienced severe pain owing to the prolonged period and multiple punctures before their executions were halted as the expiration of their warrants was approaching.

It may be that the expanded execution time frame will allow the State to complete Mr. Barber's execution before the warrant expires. But it is unreasonable to conclude it will do anything to prevent Mr. Barber from suffering superadded pain. The expanded time frame merely affords the IV team *six additional hours* to attempt to establish an IV line, making it more, not less, likely that Mr. Barber will suffer additional pain inflicted through prolonged attempts to access his veins. This is particularly true given the evidence in the record in which Mr. Miller and Mr. Smith each recounted their own experiences during which ADOC personnel spent 90 minutes and around one hour, respectively, attempting to establish IV lines. Each alleged he experienced severe pain owing

---

[16] Though the expanded time frame is 30 hours, instead of 24 hours, the effective scheduled time of Mr. Barber's execution is the 12-hour period between July 20, 2023, at 6:00 p.m. and July 21, 2023, at 6:00 a.m. *See* Doc. 53 at 127 (defendants stating that Commissioner Hamm planned to start "executions at six p.m.," and "continuing to no later than . . . six a.m.").

23-12242                JILL PRYOR, J., Dissenting                32

to the prolonged period of time spent attempting to establish IV access through multiple punctures before his execution was halted as the expiration of his warrant was approaching.

The defendants blame the botched executions on last-minute legal challenges—which are, of course, commonplace in the execution-warrant setting. The district court accepted as fact ADOC's representation that "single-day execution warrant[s] that would expire at midnight . . . caused unnecessary deadline pressure for [ADOC] personnel." Doc. 1-5 at 2. But ADOC has never said, and the record contains no evidence, that decreased time pressure will increase the IV team's ability to achieve IV access. I see no evidence of a causal link supporting an inference that making it "harder for inmates to run out the clock" ensures the IV team will be able to establish IV access without subjecting the prisoner to prolonged, painful attempts to do so. *Id.* The district court clearly erred by concluding the expanded time frame would alleviate that problem.

Further, the defendants have taken the position that they can, consistent with the Eighth Amendment, persist in painful attempts to establish IV access as long as they find it "necessary":

> THE COURT: Well, would you agree with me that at some point it could cross the line into an Eighth Amendment violation? That the attempts to find a vein to access for IV placement, that there has to be a line?

23-12242                JILL PRYOR, J., Dissenting                33

> COUNSEL:  Hypothetically, Your Honor, you know, I think that the deciding line is necessity. We heard some testimony earlier about attempting to gain IV access in a hospital setting. You don't stop because you have to do it.
>
> You know, hypothetically if an inmate was actually being punctured, quote, all over his body in locations where you couldn't obtain IV access, it wouldn't be necessary. If we obtained IV access and we continued puncturing the condemned, that would not be necessary. But it's the State's position that the attempts to gain IV access necessary—you know, it's the necessity that really matters.
>
> I couldn't possibly speak to the discretion that resides with Defendant [Commissioner] Hamm to decide whether it's possible, and we have certainly in previous cases decided to cease efforts to obtain IV access. But I couldn't speak to where that line would be as I stand here right now, Your Honor.

Doc. 53 at 131–32. Under the defendants' view, if they deem it "necessary," ADOC could use the additional six hours to attempt IV access on Mr. Barber.

In the absence of other meaningful changes, the additional six hours of time for ADOC personnel to attempt to set IV lines, through the standard procedure or through the more complicated central line procedure, and administer the lethal injection makes it more likely that Mr. Barber will experience prolonged, painful efforts to establish IV lines. The district court's finding that this

23-12242            JILL PRYOR, J., Dissenting            34

"meaningful change" disrupts the pattern, defeating Mr. Barber's likelihood of succeeding on his Eighth Amendment claim, is not supported by substantial evidence, and is therefore clearly erroneous.[17]

     *2. Mr. Barber has identified an alternative method of execution.*

Mr. Barber has also satisfied the second prong of his Eighth Amendment claim. I agree with the district court that he "successfully identified nitrogen hypoxia as a feasible, readily implemented alternative method of execution." Doc. 51 at 14. Our binding precedent in *Price* establishes that nitrogen hypoxia is an alternative method of execution in Alabama as a matter of law. 920 F.3d at 1328; *see also Smith*, 2022 WL 17069492, at *5 (holding nitrogen hypoxia is an available alternative).

---

[17] The district court made another distinct error in concluding that Mr. Barber failed to demonstrate a substantial risk of serious harm. The court concluded that Mr. Barber's Eighth Amendment claim failed because he made "no allegation in his complaint that he has a specific, physical condition or infirmity that makes it more difficult to access his veins." Doc. 51 at 17–18. Although in *Smith* this Court noted Mr. Smith's allegations that his medical condition would make IV access more difficult, we have never held that such allegations are required. Put differently, we have never held that a pattern such as Mr. Smith and now Mr. Barber alleged would not suffice to state a claim. But, even assuming Mr. Barber must provide some evidence of personalized risk that the IV team will struggle to access his veins, he provided documentary evidence of his own high body-mass index and testimony at the preliminary injunction hearing that ADOC personnel have struggled in the past to access his veins.

**B.    Mr. Barber satisfies the stay-of-execution factors.**

I dissent, too, from the majority's decision to deny Mr. Barber's motion to stay his execution. I would conclude that he satisfied the relevant factors and the equities weigh in favor of granting him a stay.

### 1.  *Mr. Barber is likely to succeed on the merits.*

As explained above, I would conclude that the district court abused its discretion by denying Mr. Barber's motion to preliminarily enjoin the State from executing him by lethal injection. For the same reasons, he is likely to succeed on the merits of his Eighth Amendment claim. As I see it, this factor weighs heavily in favor of granting Mr. Barber's motion to stay his execution pending the resolution of his constitutional challenge.

### 2.  *Mr. Barber faces irreparable injury if a stay is not granted.*

Having determined that Mr. Barber faces a substantial risk of "superadd[ed] pain" if the State attempts to execute him by lethal injection, I would conclude Mr. Barber would be irreparably harmed if we do not grant him a stay-of-execution. The defendants do not contest that this factor weighs in Mr. Barber's favor.

### 3.  *A stay would not substantially injure the defendants.*

I also would conclude that a stay would not cause the defendants substantial injury. Throughout this litigation, Mr. Barber has sought narrow, limited relief: to stay his execution *by lethal injection* until his Eighth Amendment claim is adjudicated. This means that the defendants remain free to execute him by

other means, including nitrogen hypoxia, which Commissioner Hamm and Attorney General Marshall have repeatedly stated is "close" to being available, perhaps as soon as the end of the year.[18] The defendants' own representations during this litigation have caused confusion on this very issue. In their brief opposing Mr. Barber's motion for a preliminary injunction, the defendants asked the district court to craft Mr. Barber's relief such that the State could still proceed with his execution by nitrogen hypoxia *on July 20, 2023*. When asked during the preliminary injunction hearing if the State was, in fact, ready to perform executions using nitrogen hypoxia, counsel for the defendants demurred and said they were not.

And the fact that Governor Ivey waited until May 30 and then chose a 30-hour warrant period commencing on July 20, knowing that Mr. Barber had filed this lawsuit, demonstrates that the State's time frame is arbitrary and the need to execute Mr. Barber immediately has been manufactured or manipulated. A minimal delay in the face of a serious constitutional claim does not amount to substantial injury to the defendants.

    4.  *The public interest weighs in favor of a stay.*

The final factor—whether the stay would be adverse to the public interest—weighs firmly in Mr. Barber's favor. *See Price,*

---

[18] *See, e.g.*, Kim Chandler, *Alabama 'Close' to Finishing Nitrogen Execution Protocol*, Associated Press, Feb. 15, 2023, https://apnews.com/article/crime-alabama-5818261f3209a332bb4badf280960ca1       [https://perma.cc/4NLY-6SD9].

920 F.3d at 1323. We have held that "the public interest is served when constitutional rights are protected." *Democratic Exec. Comm. of Fla. v. Lee*, 915 F.3d 1312, 1327 (11th Cir. 2019). "[N]either Alabama nor the public has any interest in carrying out an execution in a manner that violates . . . the laws of the United States." *Ray v. Comm'r, Ala. Dep't of Corr.*, 915 F.3d 689, 702 (11th Cir. 2019). The public interest would not be harmed by a delay.

> 5. *Because Mr. Barber has not unreasonably delayed seeking relief, the equities do not weigh against a stay.*

Mr. Barber has pursued his Eighth Amendment claim with reasonable diligence. The defendants argue that we should deny Mr. Barber's stay motion because he "intentionally delayed" suing the defendants "as long as he possibly could." Appellees' Br. at 6. They contend that delay merits denial of the motion to stay because "[l]ast-minute stays should be the extreme exception, not the norm, and the last-minute nature of an application that could have been brought earlier or an applicant's attempt at manipulation may be grounds for denial of a stay." *Bucklew*, 139 S. Ct. at 1134 (internal quotation marks omitted). But I am not persuaded that Mr. Barber has engaged in "dilatory litigation tactics," Appellees' Br. at 9, that turn the equities against a stay of execution.

Attorney General Marshall moved the Alabama Supreme Court to authorize Mr. Barber's execution on February 24, 2023—the same day Commissioner Hamm announced that ADOC's review was complete. In the defendants' version of events, Mr. Barber "did nothing" to challenge his execution by lethal injection

23-12242          JILL PRYOR, J., Dissenting          38

for three months between February and when he filed his federal lawsuit on May 25. *Id.* at 7. But their timeline is misleading. Mere days after Attorney General Marshall filed his motion to set Mr. Barber's execution date as March 31, Mr. Barber opposed the motion in the Alabama Supreme Court and sought discovery regarding ADOC's investigation. The Alabama Supreme Court did not issue its order authorizing Mr. Barber's execution until May 3. Mr. Barber was not doing "nothing" between February and May— he was litigating his case in state court.

When Mr. Barber initiated this action in district court on May 25, Governor Ivey had not yet set his execution date. Five days later, she announced that the State would execute Mr. Barber during the 30-hour time frame beginning July 20, 2023, at 12:00 a.m. Governor Ivey set that date—less than two months away—despite knowing that Mr. Barber had sued the defendants (including Governor Ivey) in federal court. Thus, the compressed timeline is a result of Governor Ivey's actions rather than of Mr. "Barber's own creation." *Id.* at 5.

As to the defendants' argument that Mr. Barber could have filed his lawsuit at any time after the failed execution of Mr. Smith on November 17, 2022, they conveniently ignore Governor Ivey's order that the State pause its executions while ADOC conducted a thorough review of its execution protocol and process. Had Mr. Barber sued the defendants while the investigation was pending, the defendants surely would have responded that Commissioner Hamm's promise to review the State's lethal-injection protocol and

processes would remedy the issues that plagued the executions of Mr. James, Mr. Miller, and Mr. Smith.

Mr. Barber has diligently pursued his Eighth Amendment claim such that the equities weigh in his favor.

## CONCLUSION

Three botched executions in a row are three too many. Each time, ADOC has insisted that the courts should trust it to get it right, only to fail again. Mr. Barber has raised a serious and substantial Eighth Amendment claim that the pattern will continue to repeat itself. The district court clearly erred, and therefore abused its discretion, in finding that changes in IV team personnel and amendments to the procedural rule giving ADOC extra time to complete executions will stop this pattern without any evidence of what caused the past problems or how these changes will address those specific causes. Meanwhile, ADOC has refused to answer discovery designed to answer these very questions. I respectfully dissent because I would stay Mr. Barber's execution and reverse the district's denial of a preliminary injunction so that the State may not moot his claims before ever having to answer for its extraordinary and systemic failures.